OPINION
SLOVITER, Circuit Judge.
This appeal requires us to decide whether the public has a right of access under the First Amendment to Delaware’s state-sponsored arbitration program. Chancellor Strine and the judges of the Delaware Chancery Court (“Appellants”), who oversee the arbitrations, appeal a judgment on the pleadings entered in favor of the Delaware Coalition for Open Government (the “Coalition”). The District Court found that Delaware’s proceedings were essentially civil trials that must be open to the public. Appellants dispute the similarities and argue that the First Amendment does not mandate a right of public access to Delaware’s proceedings.
I.
In early 2009, in an effort to “preserve Delaware’s preeminence in offering cost-effective options for resolving disputes, particularly those involving commercial, corporate, and technology matters,” Delaware amended its code to grant the Court of Chancery “the power to arbitrate business disputes.” H.B. 49, 145th Gen. Assemb. (Del. 2009). As a result, the Court of Chancery created an arbitration process as an alternative to trial for certain kinds of disputes. As currently implemented, the proceeding is governed both by statute and by the Rules of the Delaware Court of Chancery. See 10 Del.Code Ann. tit. 10, § 349 (2009); Del. Ch. R. 96-98.
Delaware’s government-sponsored arbitrations are not open to all Delaware citizens. To qualify for arbitration, at least one party must be a “business entity formed or organized” under Delaware law, tit. 10 § 347(a)(3), and neither party can be a “consumer,” id. § 347(a)(4). The statute is limited .to monetary disputes that involve an amount-in-controversy of at least one million dollars. Id. § 347(a)(5).
Once qualified parties have consented “by agreement or by stipulation” to avail themselves of the proceeding, they can petition the Register in Chancery to start arbitration. Id. § 347(a)(1); Del. Ch. R. 97(a). The fee for filing is $12,000, and the arbitration costs $6,000 per day after the first day. Standing Order of Del. Ch. (Jan. 4, 2010). After receiving a petition the Chancellor selects a Chancery Court judge to hear the arbitration. See Del. Ch. R. 97(b); tit. 10, § 347(a).[1] The arbi *513 tration begins approximately ninety days after the petition is filed, and, as the parties agreed in oral argument, is conducted in a Delaware courthouse during normal business hours. See Del. Chr. R. 97(e). Regular Court of Chancery Rules 26-37, governing depositions and discovery, apply to the proceeding, but the rules can be modified by consensual agreement of the parties. See id. at 96(c); id. at 26-37.
The Chancery Court judge presiding over the proceeding “[m]ay grant any remedy or relief that [s/he] deems just and equitable and within the scope of any applicable agreement of the parties.” Id. at 98(f)(1). Once a decision is reached, a final judgment or decree is automatically entered. Id. at 98(f)(3). Both parties have a right to appeal the resulting “order of the Court of Chancery” to the Delaware Supreme Court, but that court reviews the arbitration using the deferential standard outlined in the Federal Arbitration Act. Tit. 10, § 349(c). Arbitrations can therefore only be vacated in relatively rare circumstances, such as when a party can prove that the “award was procured by corruption, fraud, or undue means” or that the “arbitrator[ ] w[as] guilty of misconduct.” 9 U.S.C. § 10; see also Metromedia Energy, Inc. v. Enserch Energy Servs., Inc., 409 F.3d 574, 578 (3d Cir.2005).
Both the statute and rules governing Delaware’s proceedings bar public access. Arbitration petitions are “considered confidential” and are not included “as part of the public docketing system.” Tit. 10, § 349(b); Del. Ch. R. 97(4). Attendance at the proceeding is limited to “parties and their representatives,” and all “materials and communications” produced during the arbitration are protected from disclosure in judicial or administrative proceedings. Del. Ch. R. 98(b).
If one of the parties appeals to the Supreme Court of Delaware for enforcement, stay, or vacatur, the record of the proceedings must be filed “with the Supreme Court in accordance with its Rules.” Id. at 97(a)(4). “The petition and any supporting documents are considered confidential and not of public record until such time, if any, as the proceedings are the subject of an appeal.” Id. The Delaware Supreme Court has yet to adopt rules that would govern the confidentiality of appeals from Delaware’s arbitration program, and there is no record of a public appeal from an arbitration award.
In the District Court, the Coalition moved for judgment on the pleadings, arguing that the confidentiality of Delaware’s government-sponsored arbitration proceedings violated the First Amendment. The District Court granted the Coalition’s motion. The judges of the Delaware Chancery Court appeal.
II.
The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise de novo review over the District Court’s grant of a motion for judgment on the pleadings. DiCarlo v. St. Mary Hosp., 530 F.3d 255, 259 (3d Cir.2008).
“The First Amendment, in conjunction with the Fourteenth, prohibits governments from ‘abridging the freedom of speech, or of the press.." Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 575, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (quoting U.S. CONST, amend. I). This protection of speech includes a right of public access to trials, a right first elucidated by the Supreme Court in Richmond Newspapers. In that case the Court found that a Virginia trial court had violated the First Amendment by closing a criminal trial to the public. See id. at 580, 100 *514 S.Ct. 2814. Chief Justice Burger’s opinion for the plurality emphasized the important role public access plays in the administration of justice and concluded that “[t]he explicit, guaranteed rights to speak and publish concerning what takes place at a trial would lose much meaning if access to observe the trial could ... be foreclosed arbitrarily.” Id. at 576-77, 100 S.Ct. 2814.
The Court has since found that the public also has a right of access to voir dire of jurors in criminal trials, see Press-Enter. Co. v. Superior Court, 464 U.S. 501, 511, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (“Press I”), and to certain preliminary criminal hearings. See El Vocero de P.R. v. Puerto Rico, 508 U.S. 147, 149-50, 113 S.Ct. 2004, 124 L.Ed.2d 60 (1993) (per curiam) (preliminary criminal hearings as conducted in Puerto Rico); Press-Enter. Co. v. Superior Court, 478 U.S. 1, 10, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (“Press II ”) (preliminary criminal hearings as conducted in California).
We have found a right of public access to civil trials, as has every other federal court of appeals to consider the issue. See Publicker Indus., Inc. v. Cohen, 733 F.2d 1059 (3d Cir.1984); see also F.T.C. v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 410 (1st Cir.1987); Westmoreland v. Columbia Broad. Sys., Inc., 752 F.2d 16, 23 (2d Cir.1984); Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir.1988); Brown & Williamson Tobacco Corp. v. F.T.C, 710 F.2d 1165, 1179 (6th Cir.1983); In re Cont’l Ill. Sec. Litig., 732 F.2d 1302, 1309 (7th Cir.1984). In addition to finding a right of public access to civil trials, we have also found a First Amendment right of the public to attend meetings of Pennsylvania city planning commissions and post-trial juror examinations. See Whiteland Woods, L.P. v. Twp. of W. Whiteland, 193 F.3d 177, 180-81 (3d Cir.1999) (planning commissions); United States v. Simone, 14 F.3d 833, 840 (3d Cir.1994) (post-trial juror examinations). We have declined, however, to extend the right to the proceedings of judicial disciplinary boards, the records of state environmental agencies, deportation hearings, or the voting process. See First Amendment Coal. v. Judicial Inquiry & Review Bd., 784 F.2d 467, 477 (3d Cir.1986) (en banc) (judicial disciplinary board); Capital Cities Media, Inc. v. Chester, 797 F.2d 1164, 1175-76 (3d Cir.1986) (en banc) (records of state environmental agencies); N. Jersey Media Grp., Inc. v. Ashcroft, 308 F.3d 198, 209 (3d Cir.2002) (deportation hearings); PG Publ’g Co. v. Aichele, 705 F.3d 91, 112 (3d Cir.2013) (voting process).
The Experience and Logic Test
A proceeding qualifies for the First Amendment right of public access when “there has been a tradition of accessibility” to that kind of proceeding, and when “access plays a significant positive role in the functioning of the particular process in question.” Press II, 478 U.S. at 10, 8, 106 S.Ct. 2735. The examination of the history and functioning of a proceeding has come to be known as the “experience and logic” test. See, e.g., Simone, 14 F.3d at 838. In order to qualify for public access, both experience and logic must counsel in favor of opening the proceeding to the public. See N. Jersey Media Grp., 308 F.3d at 213-14. Once a presumption of public access is established it may only be overridden by a compelling government interest. Press II, 478 U.S. at 9, 106 S.Ct. 2735.
The District Court did not apply the experience and logic test. Instead, it concluded that because Delaware’s government-sponsored arbitration was “sufficiently like a trial,” and because a right of public access applies to civil trials, a right of public access must also apply to Dela *515 ware arbitrations. See Del. Coal. for Open Gov’t v. Strine, 894 F.Supp.2d 493, 500 (2012) (quoting El Vocero, 508 U.S. at 149, 113 S.Ct. 2004). We find the District Court’s reliance on El Vocero misplaced and its decision to bypass the experience and logic test inappropriate. In El Vocero the Supreme Court held in a per curiam opinion that the First Amendment right of public access applies to preliminary criminal hearings in Puerto Rico. The Supreme Court did not engage in an experience and logic analysis in that case, but that was because it had already conducted such an inquiry in Press I, a case concerning nearly identical preliminary hearings in California. See El Vocero, 508 U.S. at 149,113 S.Ct. 2004 (citing Press II, 478 U.S. at 12, 106 S.Ct. 2735).
Although Delaware’s arbitration proceeding shares a number of features with a civil trial, the two are not so identical as to fit within the narrow exception articulated by the Supreme Court in El Vocero. We therefore must examine Delaware’s proceeding under the experience and logic test.

A. Experience

Under the experience prong of the experience and logic test, we “consider whether ‘the place and process have historically been open to the press and general public,’ because such a ‘tradition of accessibility implies the favorable judgment of experience.’ ” N. Jersey Media Grp., 308 F.3d at 211 (quoting Press II, 478 U.S. at 8, 106 S.Ct. 2735). In order to satisfy the experience test, the tradition of openness must be strong; however, “a showing of openness at common law is not required.” PG Publ’g Co., 705 F.3d at 108 (quoting N. Jersey Media Grp., 308 F.3d at 213) (internal quotation marks omitted).
The litigants in this case disagree over which history is relevant to Delaware’s proceedings. The Appellants suggest that we only examine the history of arbitrations, whereas the Coalition suggests we only examine the history of civil trials. Neither suggestion is appropriate in isolation. If we were to only analyze the history of arbitrations as the Appellants suggest, we would be accepting the state’s designation of its proceedings as arbitrations at face value. Uncritical acceptance of state definitions of proceedings would allow governments to prevent the public from accessing a proceeding simply by renaming it. A First Amendment right that mandated access to civil trials, but allowed closure of identical “sivel trials” would be meaningless. Thus, the Supreme, Court has hqld that “the First. Amendment question cannot be resolved solely on the label we give the event, i.e., ‘trial’ or otherwise.” Press II, 478 U.S. at 7, 106 S.Ct. 2735. The Coalition’s suggestion — that we rely solely on the history of civil trials — is also flawed. Defining Delaware’s proceeding as a civil trial at the outset would beg the question at issue here, and elide the differences between Delaware’s arbitration proceeding and other civil proceedings.
There is no need to engage in so narrow a historical inquiry as the parties suggest. In determining the bounds of our historical inquiry, we look “not to the practice of the specific public institution involved, but rather to whether the particular type of government proceeding [has] historically been open in our free society.” PG Publ’g Co., 705 F.3d at 108 (quoting Capital Cities, 797 F.2d at 1175) (internal quotation marks omitted) (emphasis in PG Publ’g Co.). In prior public access cases we have defined the type of proceeding broadly, and have often found “wide-ranging” historical inquiries helpful to our analysis of the First Amendment right of public access. Id. Thus in North Jersey Media Group, a case involving deportation *516 hearings, we considered the entire history of access to “political branch proceedings.” N. Jersey Media Grp., 308 F.3d at 209. We exercised a similarly broad approach in PG Publishing Company, a case involving a challenge to a state statute restricting access to polling places in which we analyzed “not just the act of voting, but also the act of entering the polling place and signing in to vote.” See PG Publ’g Co., 705 F.3d at 109.
Following this broad historical approach, we find that an exploration of both civil trials and arbitrations is appropriate here. Exploring both histories avoids begging the question and allows us to fully consider the “judgment of experience.” Press II, 478 U.S. at 11, 106 S.Ct. 2735 (internal quotation marks omitted).

1. Civil Trials and the Courthouse

As we explained in Publicker, there is a long history of access to civil trials. See Publicker, 733 F.2d at 1068-70. The English history of access dates back to the Statute of Marlborough passed in 1267, which required that “all Causes ... to be heard, ordered, and determined before the Judges of the King’s Courts [were to be heard] openly in the King’s Courts.” Id. at 1068 (citing 2 Edward Coke, Institutes of the Law of England 103 (6th ed. 1681)) (emphasis in Publicker). This tradition of openness continued in English Courts for centuries, ensuring that evidence was delivered “ ‘in the open Court and in the Presence of the Parties, their Attorneys, Council, and all By-standers, and before the Judge and Jury....’” Id. (quoting Matthew Hale, History of the Common Law of England 163 (Charles M. Gray ed., U. Chicago Press 1971) (1713)). Thus, “ ‘one of the most conspicuous features of English justice, that all judicial trials are held in open court, to which the public have free access, ... appears to have been the rule in England from time immemorial.’ ” Id. at 1069 (quoting Edward Jenks, The Book of English Law 73-74 (6th ed.1967)).
This tradition of access to trials and the courthouse was adopted by the American colonies and preserved after the American Revolution. See id. Courthouses served a central place in colonial life, encouraging “the active participation of community members” in shaping the “local practice of justice.” Norman W. Spaulding, The Enclosure of Justice: Courthouse Architecture, Due Process, and the Dead Metaphor of Trial, 24 Yale J.L. & Human. 311, 318-19 (2012). As courthouses grew increasingly elaborate in the late-eighteenth century, they continued to encourage public viewing, albeit in more formal surroundings. See id. at 329-32. The courtroom also maintained its important public role: “[w]ith juries, spectators from the community, and press all present,” the courtroom “became a public state — a familiar, indeed immediately recognizable enclosure, in which the process of rights definition was made public....” Id. at 332.
Today, civil trials and the court filings associated with them are generally open to the public. Id; see, e.g., Del. Ch. R. 5.1(g)(1). The courthouse, courtroom, and trial remain essential to the way the public conceives of and interacts with the judicial system. See David Ray Papke, The Impact of Popular Culture on American Perceptions of the Courts, 82 Ind. L. J. 1225, 1233-34 (2007); see also Spaulding, 24 Yale J.L. & Human, at 342.

2. Arbitrations

Arbitrations also have a long history. Written records of proceedings resembling arbitrations have been found in England as early as the twelfth century. See 1 Martin Domke et al., Domke on Commercial Arbitration § 2:5 (3d ed.2011); 1 Ian R. *517 Macneil et al., Federal Arbitration Law: Agreements, Awards, and Remedies under the Federal Arbitration Act § 4.2.1 (1999). Early arbitrations involved community participation, and evidence suggests that they took place in public venues. See Edward Powell, Settlement of Disputes by Arbitration in Fifteenth-Century England, 2 Law & Hist. Rev. 21, 29, 33-34 (1984); see generally Letters and Papers of John Shillingford, Mayor of Exeter 1447-50 at 8 (Stuart A. Moore ed., 1871) (detailing arbitration proceeding overseen by chancellor and judges). The use of arbitrations to resolve private disputes, however, was limited by English precedent, which prevented the enforcement of binding agreements to arbitrate. See Macneil § 4.2.2.
In the American colonies, arbitrations provided a way for colonists who harbored “suspicion of law and lawyers” to resolve disputes in their communities in a “less public and less adversarial” way. Jerold S. Auerbach, Justice Without Law?: Resolving Disputes Without Lawyers 4 (1983); Bruce H. Mann, The Formalization of Informal Law: Arbitration Before the American Revolution, 59 N.Y.U. L.Rev. 443, 454 (1984). By the eighteenth century, however, arbitrations adopted increasingly formal procedures, and at least some appear to have taken place in public. See Mann, The Formalization of Informal Law at 468.
As the American economy grew, disputes over business transactions led to the further development of arbitration proceedings. These proceedings were occasionally supervised by a member of the judiciary “not acting in his official capacity.” Id. at 475. The popularity of commercial arbitration, however, was limited by precedent that made agreements to arbitrate essentially unenforceable. See Macneil § 4.3.2; see also Amalia D. Kessler, Deciding Against Conciliation: The Nineteenth-Century Rejection of a Eu/ropean Transplant and the Rise of a Distinctively American Ideal of Adversarial Adjudication, 10 Theoretical Inquires L. 423, 445-46 (2009). It was not until the passage of New York’s Arbitration Act of 1920 and the Federal Arbitration Act of 1925, that arbitration agreements began to be treated by the courts like ordinary contracts. Domke § 2:8; see also Macneil § 4.1.2. These arbitration acts allowed private arbitration to take on the important role it now serves in resolving commercial disputes. See Macneil §§ 5.3, 5.4.
Modern arbitration law has led to the development of an industry devoted to offering arbitration services. Groups such as the American Arbitration Association and JAMS, Inc. facilitate arbitration by appointing arbitrators, organizing hearings, and setting arbitration standards. See Stephen Hayford & Ralph Peeples, Commercial Arbitration in Evolution: An Assessment and Call for Dialogue, 10 Ohio St. J. on Disp. Resol. 343, 362-68 (1995). These arbitrations, unlike some of their antecedents, are distinctly private. Parties engaged in arbitration must pay both for the arbitrations and for the space in which the arbitrations occur, and they usually choose to close their arbitrations to the public. See Michael Collins, Privacy and Confidentiality in Arbitration Proceedings, 30 Tex. Int’l L.J. 121,122 (1995). But see 3 Macneil et al., Federal Arbitration Law § 32.6.1 (1999) (noting that parties can elect to allow access to proceedings).
Although modern arbitration is dominated by private actors, a number of jurisdictions offer alternative dispute resolution procedures as a supplement to civil litigation. See generally Yishai Boyarín, Court-Connected ADR — A Time of Crisis, A Time of Change, 50 Fam. Ct. Rev. 377 *518 (2012). These procedures are sometimes called arbitrations, but unlike private arbitrations, they are usually non-binding, and can sometimes be initiated without the parties’ consent. See Amy J. Schmitz, Nonconsensual + Nonbinding — Nonsensical? Reconsidering Court-Connected Arbitration Programs, 10 Cardozo J. Conflict Resol. 587, 588-89, 618 (2009).
The history of arbitration thus reveals a mixed record of openness. Although proceedings labeled arbitrations have sometimes been accessible to the public, they have often been closed, especially in the twentieth century. This closure, however, can be explained by the private nature of most arbitrations. Confidentiality is a natural outgrowth of the status of arbitrations as private alternatives to government-sponsored proceedings. Indeed, we would be surprised to find that private arbitrations — taking place before private arbitrators in private venues — had historically been accessible to the public.
Taking the private nature of many arbitrations into account, the history of civil trials and arbitrations demonstrates a strong tradition of openness for proceedings like Delaware’s government-sponsored arbitrations. Proceedings in front of judges in courthouses have been presumptively open to the public for centuries. History teaches us not that all arbitrations must be closed, but that arbitrations with non-state action in private venues tend to be closed to the public.[2] Although Delaware’s government-sponsored arbitrations share characteristics such as informality, flexibility, and limited review with private arbitrations, they differ fundamentally from other arbitrations because they are conducted before active judges in a courthouse, because they result in a binding order of the Chancery Court, and because they allow only a limited right of appeal.
When we properly account for the type of proceeding that Delaware has instituted — a binding arbitration before a judge that takes place in a courtroom — the history of openness is comparable to the history that this court described in Publicker and the Supreme Court found in Richmond Newspapers. Thus, unlike the “recent-and rebuttable-regulatory (sic) presumption” of openness in deportation hearings we examined in North Jersey Media Group, 308 F.3d at 213, or the “long-standing trend away from openness” in the electoral process we found in PG Publishing Co., 705 F.3d at 110, the right of access to government-sponsored arbitrations is deeply rooted in the way the judiciary functions in a democratic society. Our experience inquiry therefore counsels in favor of granting public access to Delaware’s proceeding because both the “place and process” of Delaware’s proceeding “have historically been open to the press and general public.” Press II, 478 U.S. at 8, 106 S.Ct. 2735.

B. Logic

Under the logic prong of the experience and logic test we examine whether “access plays a significant positive role in the functioning of the particular process in question.” Id. We consider both the positive role that access plays, and also “the extent to which openness impairs the pub- *519 lie good.” N. Jersey Media Grp., 308 F.3d at 202.
We have recognized that public access to judicial proceedings provides many benefits, including [1] promotion of informed discussion of governmental affairs by providing the public with the more complete understanding of the [proceeding]; [2] promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings; [3] providing a significant community therapeutic value as an outlet for community concern, hostility and emotion; [4] serving as a check on corrupt practices by exposing the [proceeding] to public scrutiny; [5] enhancement of the performance of all involved; and [6] discouragement of [fraud],
PG Publ’g Co., 705 F.3d at 110-11 (quoting Simone, 14 F.3d at 839). All of these benefits would accrue with the opening of Delaware’s proceeding. Allowing public access to state-sponsored arbitrations would give stockholders and the'public a better understanding of how Delaware resolves major business disputes. Opening the proceedings would also allay the public’s concerns about a process only accessible to litigants in business disputes who are able to afford the expense of arbitration. In addition, public access would expose litigants, lawyers, and the Chancery Court judge alike to scrutiny from peers and the press. Finally, public access would discourage perjury and ensure that companies could not misrepresent their activities to competitors and the public.
The benefits of openness weigh strongly in favor of granting access to Delaware’s arbitration proceedings. In comparison, the drawbacks of openness that Appellants cite are relatively slight. First, Appellants contend that confidentiality is necessary to protect “patented information, trade secrets, and other closely held information.” Appellants’ Br. at 60. This information, however, is already protected under Delaware Chancery Court Rule 5.1, which provides for the confidential filing of documents, including “trade secrets; sensitive proprietary information; [and] sensitive financial, business, or personnel information” when “the public interest in access to Court proceedings is outweighed by the harm that public disclosure of sensitive, non-public information would cause.” Del. Ch. R. 5.1(b)(2). These tailored protections are compatible with the First Amendment right of public access. See Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33-36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).
Second, Delaware argues that confidentiality is necessary to prevent the “ ‘loss of prestige and goodwill’ ” that disputants would suffer in open proceedings. Appellants’ Br. at 60 (quoting J. Noble Braden, Sound Rules and Administration in Arbitration, 83 U. Pa. L.Rev. 189, 195 (1934)). Although the loss of prestige and goodwill may be unpleasant for the parties involved, it would not hinder the functioning of the proceeding, nor impair the public good. As we have previously held, the exposure of parties to public scrutiny is one of the central benefits of public access. See, e.g., PG Publ’g Co., 705 F.3d at 110-11.
The Appellants’ third argument is that privacy encourages a “less hostile, more conciliatory approach.” See Appellants’ Br. at 61 (citing Alan Scott Rau et al„ Processes of Dispute Resolution: The Role of Lawyers 601 (3d ed.2002)). This may sometimes be true, but even private binding arbitrations can be contentious. See Raymond G. Bender, Jr., Arbitration — An Ideal Way to Resolve High-Tech Industry Disputes, 65 Disp. Resol. J. 44, 49 (2010) (“[A]dvocates seeking to achieve the best outcomes for their clients *520 have interjected litigation-like techniques into arbitration — contentious advocacy, uncontrolled discovery, aggressive motion practice, and other adversarial techniques aimed at achieving a ‘leg-up’ in the contest.”). Moreover, informality, not privacy, appears to be the primary cause of the relative collegiality of arbitrations. See Alan Scott Rau et al, Processes of Dispute Resolution, 601 (1989) (citing “relative informality” of arbitration as reason for reduced contentiousness); Christopher Baum, The Benefits of Alternative Dispute Resolution in Common Interest Development Disputes, 84 Saint John’s L.Rev. 907, 925 (2010) (“Arbitration is also less contentious than litigation because the formal rules of evidence do not apply, unless the parties agree otherwise.”). We therefore do not find that a possible reduction in conciliation caused by public access should weigh heavily in our analysis.
Finally, Appellants argue that opening the proceeding would effectively end Delaware’s arbitration program. This argument assumes that confidentiality is the sole advantage of Delaware’s proceeding over regular Chancery Court proceedings. But if that were true — if Delaware’s arbitration were just a secret civil trial — it would clearly contravene the First Amendment right of access. On the contrary: as the Appellants point out in the rest of their brief, there are other differences between Delaware’s government-sponsored arbitration and regular Chancery Court proceedings. Arbitrations are entered into with the parties’ consent, the parties have procedural flexibility, and the arbitrator’s award is subject to more limited review. Thus, disputants might still opt for arbitration if they would like access to Chancery Court judges in a proceeding that can be faster and more flexible than regular Chancery Court trials.[3]
I agree with Judge Roth on the virtues of arbitration. I cannot help but question why the Delaware scheme limits those virtues to litigants whose disputes involve an amount in controversy of at least a million dollars, and neither of whom is a consumer. One wonders why the numerous advantages set forth in Judge Roth’s dissenting opinion (which apparently motivated the Delaware legislature) should not also be available to businesspersons with less than a million dollars in dispute. I see no explanation in Judge Roth’s dissent for the limitation to rich businesspersons.
In her dissent, Judge Roth states that she believes that I do not appreciate the difference between adjudication and arbitration, i.e., “that a judge in a judicial proceeding derives her authority from the coercive power of the state, while a judge serving as an arbitrator derives her authority from the consent of the parties.” Indeed I do.
Delaware’s proceedings are conducted by Chancery Court judges, in Chancery Court during ordinary court hours, and yield judgments that are enforceable in the same way as judgments resulting from ordinary Chancery Court proceedings. Delaware’s proceedings derive a great deal of legitimacy and authority from the state. They would be far less attractive without their association with the state. Therefore, the interests of the state and the public in openness must be given weight, not just the interests of rich businesspersons in confidentiality.
*521 Like history, logic weighs in favor of granting access to Delaware’s government-sponsored arbitration proceedings. The benefits of access are significant. It would ensure accountability and allow the public to maintain faith in the Delaware judicial system. A possible decrease in the appeal of the proceeding and a reduction in its conciliatory potential. are comparatively less weighty, and they fall far short of the “profound” security concerns we found compelling in North Jersey Media Group. See 308 F.3d at 220.
III.
Because there has been a tradition of accessibility to proceedings like Delaware’s government-sponsored arbitration, and because access plays an important role in such proceedings, we find that there is a First Amendment right of access to Delaware’s government-sponsored arbitrations. We will therefore affirm the order of the District Court.

. Although the statute governing Delaware’s procedure allows for the Chancellor to appoint non-Chanceiy Court judges as arbitraters, see tit. 10, § 347(a), the Coalition only challenges arbitration by a member of the court.

. Understood in this way, the closure of private arbitrations is only of questionable relevance. Meetings by private organizations, for example, are usually closed to the public, yet we did not consider this history of closure when we found a First Amendment right of public access to city planning commissions. See Whiteland Woods, L.P. v. Twp. of W. Whiteland, 193 F.3d 177 (3d Cir.1999). Nor did we consider the history of access to votes undertaken by private organizations, when we examined the history of the voting process. See PG Publ’g Co., 705 F.3d at 110.

. Even if granting public access to Delaware’s arbitrations were to limit their appeal, parties would still have two effective alternatives: private arbitration or public proceedings before the Chancery Court. Thus, Appellants’ contention that allowing public access to Delaware's state-sponsored arbitration proceedings would lead to a mass exodus of corporations is overstated.