IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2014 Term

FILED

November 14, 2014

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 13-1193

THE WEST VIRGINIA INVESTMENT MANAGEMENT BOARD,
a public body corporate, and THE WEST VIRGINIA CONSOLIDATED
PUBLIC RETIREMENT BOARD, a public agency,
Plaintiffs Below, Petitioners

v.

THE VARIABLE ANNUITY LIFE INSURANCE
COMPANY, a Texas corporation,
Defendant Below, Respondent

Appeal from the Circuit Court of Kanawha County
Honorable James C. Stucky
Civil Action No. 09-C-2104

REVERSED WITH DIRECTIONS

Submitted:   September 30, 2014
Filed:  November 14, 2014

Gerard R. Stowers, Esq.
Special Assistant Attorney General
J. Mark Adkins, Esq.
Lenna R. Chambers, Esq.
Bowles Rice LLP
Charleston, West Virginia

Thomas J. Hurney, Jr., Esq.
Michael M. Fisher, Esq.
Erin R. Stankewicz, Esq.
Patricia M. Bello, Esq.
Jackson Kelly PLLC
Charleston, West Virginia

Anthony J. Majestro, Esq.
Powell & Majestro, PLLC
Charleston, West Virginia
Counsel for Petitioners


Jeffrey G. Blaydes, Esq.
Carbone & Blaydes P.L.L.C.
Charleston, West Virginia
Amicus Curiae–American
Federation of Teachers–West Virginia,
AFL-CIO

John Everett Roush, Esq.
Charleston, West Virginia
Amicus Curiae–The West Virginia
School Service Personnel Association

James M. Haviland, Esq.
Charleston, West Virginia
Amicus Curiae–West Virginia
Education Association

Daniel McNeel Lane, Jr., *Pro Hac Vice*
Akin Gump Strauss Hauer & Feld LLP
San Antonio, Texas

Ashley B. Vinson, *Pro Hac Vice*
Danielle Crockett, *Pro Hac Vice*
Akin Gump Strauss Hauer & Feld LLP
San Francisco, California
Counsel for Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "The circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syl. Pt. 3, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

2. "In deciding whether a justiciable controversy exists sufficient to confer jurisdiction for purposes of the Uniform Declaratory Judgment[s] Act, West Virginia Code §§ 55-13-1 to -16 (1994), a circuit court should consider the following four factors in ascertaining whether a declaratory judgment action should be heard: (1) whether the claim involves uncertain and contingent events that may not occur at all; (2) whether the claim is dependent upon the facts; (3) whether there is adverseness among the parties; and (4) whether the sought after declaration would be of practical assistance in setting the underlying controversy to rest." Syl. Pt. 4, *Hustead v. Ashland Oil Co.,* 197 W.Va 55, 475 S.E.2d 55 (1996).

3. "The fiduciary duty of the Consolidated Public Retirement Board established by *W.Va. Code*, 5-10D-1 [1998] and its members, with respect to the public employee pension funds and assets entrusted to the Board, includes the affirmative duty to monitor and evaluate the effect of legislative actions that may affect such funds and assets, and to take all necessary actions including initiating court proceedings if necessary to protect

i

the fiscal and actuarial solvency of such funds and assets." Syl. Pt. 2, *State ex rel. Deputy Sheriff's Ass'n v. Sims*, 204 W.Va. 442, 513 S.E.2d 669 (1998).

4.    As a statutory trustee of this state's public retirement funds, the Consolidated Public Retirement Board has standing to bring an action under the Uniform Declaratory Judgments Act, West Virginia Code §§ 55-13-1 to -16 (2008), to resolve disputes arising from investment-related contracts that involve public retirement funds, irrespective of whether it is a party to such contracts.

5.    "Whenever the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous."  Syl. Pt. 1, *Prete v. Merchants Prop. Ins. Co.*, 159 W.Va. 508, 223 S.E.2d 441 (1976).

LOUGHRY, Justice:

The petitioners, the West Virginia Investment Management Board ("IMB") and the West Virginia Consolidated Public Retirement Board ("Board"), appeal from two orders[1] entered by the Circuit Court of Kanawha County that separately grant summary judgment to the respondent, The Variable Annuity Life Insurance Company ("VALIC"), against the IMB and the Board. The petitioners initiated the underlying action to obtain a declaratory judgment regarding their entitlement to a full surrender of two annuity contracts without delays in payment or surrender charges. Bifurcating the relief awarded based on the signatories to the annuity contracts, the trial court resolved the petitioners' claims on grounds of standing, the absence of a justiciable controversy, or the lack of ambiguity concerning the language of the policy endorsement in dispute. On appeal, the petitioners assert multiple assignments of error including the trial court's reliance on disputed issues of material fact. Upon a thorough review of the submitted record in conjunction with the issues raised, we find that the trial court committed error in its grant of summary judgment to VALIC and, accordingly, we reverse.

## I. Factual and Procedural Background

Like the trial court, we find it necessary to briefly review the history of the teachers' retirement plans and the underlying legislation relating to these plans that are at the

---

[1]The orders were both entered on October 21, 2013.

1

center of this dispute. The State Teachers Retirement System ("TRS") was created in 1941 to provide retirement benefits for public school teachers and other school service personnel.[2] From 1941 to 1970, teachers and other professional and school service personnel were required to participate in TRS. While originally a defined contribution plan, TRS became a defined benefit plan in 1970.[3] Due to funding problems affecting the solvency of TRS, the Legislature enacted the "Teacher's Retirement Reform Act" ("Reform Act") in 1990, pursuant to which a defined contribution plan ("DCP") was created. *See* W.Va. Code §§ 18-7B-1 to -21 (2012 & Supp. 2014). Subject to the provisions of the Reform Act, participants were permitted to allocate their retirement funds among various investment options in the DCP.[4]

---

[2]*See* W.Va. Code §§ 18-7A-1 to -40 (2012 & Supp. 2014).

[3]We explained the distinction between a defined benefit and a defined contribution plan in *Nesselroad v. Consolidated Public Retirement Board,* 225 W.Va. 397, 693 S.E.2d 471 (2010):

> Under its initial structure as a defined contribution plan, a retiring TRS member would receive a lump sum amount reflecting his or her total contributions; the employer's total contributions; and accrued interest. With the restructuring of TRS into a defined benefit plan that occurred in 1970, a retiring member receives a monthly annuity payment based on various actuarial assumptions such as percentage of contributions; salary; and service years.

*Id.* at 400, 693 S.E.2d at 474.

[4]Under the Reform Act, TRS was closed to new participants effective July 1, 1991; new teachers were automatically enrolled in the DCP. *See* W.Va. Code § 18-7B-7. Due to subsequent legislation, teachers hired for full time service after June 30, 2005, were

2

Pertinent to this matter are two fixed annuity contracts issued by VALIC, the first on October 8, 1991 (the "1991 Contract"),[5] and the second on November 6, 2008 (the "2008 Contract").[6] Both of the annuity contracts issued by VALIC contain an identically-worded endorsement–the terms of which purport to govern the rights of the parties with regard to a participant's decision to surrender his or her investment in the annuity.

Directly impacting the case before us was the Legislature's decision to permit DCP members to voluntarily transfer their retirement funds to TRS effective July 1, 2008. *See generally* W.Va. Code §§ 18-7D-1 to -12 (2008). This transfer could only take place if sixty-five percent of actively-contributing DCP members elected to make the transfer. *See id.* at §§ 18-7D-3, -5. According to the trial court's findings, more than seventy-eight percent of the relevant DCP participants elected to make the transfer to TRS.

The record in this case evidences that VALIC or its agent[7] was fully apprised of the legislation (House Bill 101) that, upon enactment and subsequent approval by the

precluded from participating in DCP and were required to participate in TRS. *See* W.Va. Code § 18-7B-7a.

[5]The signatory parties to the 1991 Contract were VALIC and the Board.

[6]The signatory parties to the 2008 Contract were VALIC and the IMB.

[7]In referring to VALIC, we are including communications with Jim Coppedge as Senior Vice President and General Counsel for AIG Retirement Services, the fund provider through whom the Board obtained both the 1991 Contract and the 2008 Contract.

necessary percentage of DCP participants, would permit electing DCP members to join TRS.[8]

VALIC was similarly aware of the resulting need to remove the assets of DCP participants

electing to transfer to TRS from its annuity fund. During discussions between the Board and

VALIC in advance of the DCP participants' vote, VALIC indicated that there was likely to

be a "surrender charge" of $11.5 million "in the event that all assets were cashed out in the

same year."[9] This potential surrender charge, which had not been anticipated by the Board,[10]

spawned additional and ongoing communications between VALIC, the Board, and the IMB

concerning the transfer of moneys subject to the 1991 Contract of those DCP participants

electing to join TRS.

Striving to meet its statutory duty to effectuate the timely transfer of funds from

the DCP to TRS[11] and to uphold its fiduciary obligations,[12] the Board, in active consultation

---

[8]House Bill 101 passed on March 16, 2008.

[9]This representation was first made by Jim Coppedge, Senior Vice President and General Counsel of AIG Retirement, during a meeting on March 14, 2008, at the state capitol with then governor Joe Manchin and various legislative leaders, and was later included in an electronic communication dated March 17, 2008, from Mr. Coppedge to Anne W. Lambright, Executive Director of the Consolidated Public Retirement System.

[10]One reason that a surrender charge had not been considered by the petitioners was the language in the endorsement to the 1991 Contract which provides: "There will be no surrender charges under this Contract."

[11]*See* W.Va. Code § 18-7D-5(a) (mandating transfer of assets from DCP to TRS to occur on either July 1, 2008, or August 1, 2008, depending on date of participant's election).

[12]*See* W.Va. Code § 5-10D-1(d), (g) (2013).

with the IMB, agreed to obtain a second annuity contract (the 2008 Contract) from VALIC. As the record makes clear, the 2008 Contract was purposefully designed "as an investment and funding vehicle" to "accomplish the transfer to the TRS Plan of TDC Plan [DCP] assets of electing members currently invested in a Group Annuity Contract [1991 Contract] with . . . ("VALIC")."[13] Through email communications from VALIC to the Board and the IMB, the parties documented their agreement that the second annuity contract would be "materially similar (i.e., form, endorsements, rates, and terms) to the contract issued to the CPRB [Board] for the TDCP [DCP].[14]

On December 10, 2008, the petitioners submitted a request to VALIC to transfer $248,345,458.77 from the 1991 Contract to the 2008 Contract. VALIC effectuated the transfer pursuant to the petitioners' request. On December 18, 2008, IMB requested withdrawal of all funds held under the 2008 Contract on or before December 21, 2008.[15] Due to VALIC's unalterable position that the funds were subject to withdrawal restrictions which

---

[13]*See* December 10, 2008, Letter of Understanding prepared by H. Craig Slaughter, Executive Director of IMB and signed by Jim Coppedge, Senior Vice President and General Counsel of VALIC, in agreement.

[14]*See* September 25, 2008, email communication from Jim Coppedge to Anne W. Lambright and W. Craig Slaughter, and December 10, 2008, Letter of Understanding referencing the September 25, 2008, email communication originating from Mr. Coppedge.

[15]Whereas the Board is charged statutorily with entering into contracts related to DCP funds (W.Va. Code § 18-7B-5), the IMB is legislatively authorized to enter into contracts pertaining to TRS (W.Va. Code § 12-6-5).

5

limited the petitioners to removing twenty percent of the surrender amount per year, the IMB was forced to remove funds from the 2008 Contract in accord with this five-year installment method.[16]

Based on the respondent's refusal to surrender the entirety of the affected funds in a lump sum, the petitioners instituted a declaratory judgment action against VALIC.[17] In response to the request for judicial resolution of the petitioners' right to full and unrestricted surrender of the annuity funds, VALIC removed the case to federal court.[18] Following the district court's decision to remand this case to circuit court, the petitioners amended their complaint to seek damages arising from VALIC's refusal to timely release the funds at issue.[19] Cross motions for summary judgment were filed after the completion of discovery. On October 21, 2013, the circuit court separately granted the respondent's motion for summary judgment against each of the petitioners. It is from these orders that the petitioners assert error.

---

[16]The first funds were removed on May 5, 2009, and the fifth and final withdrawal occurred in May 2013.

[17]The lawsuit was filed on November 12, 2009.

[18]Removal was sought based on diversity of citizenship.

[19]VALIC was the only fund provider that refused to permit the petitioners to have immediate access to the funds of DCP participants electing to transfer into TRS.

## II. Standard of Review

Our review in this case is unquestionably plenary as we are examining the grounds upon which the trial court relied in granting summary judgment to the respondent. *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo.*"). As we articulated in *Painter*, "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." 192 W.Va. at 190, 451 S.E.2d at 756, syl. pt. 3. Also applicable is this Court's recognition in syllabus point two of *Riffe v. Home Finders Assocs., Inc.*, 205 W.Va. 216, 517 S.E.2d 313 (1999), that "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgment, shall be reviewed *de novo* on appeal." Bearing these standards in mind, we proceed to determine whether the trial court committed error.

## III. Discussion

### A. Adverse Rulings Against the Board

### 1. Justiciable Controversy – 1991 Contract

In granting summary judgment to VALIC with regard to the Board's averments, the trial court separately examined the Board's attempt to seek relief under both the 1991 Contract and the 2008 Contract. As to the 1991 Contract, the trial court focused

7

initially on the Board's right to seek declaratory relief under the Uniform Declaratory Judgments Act (the "Act"). *See* W.Va. Code §§ 55-13-1 to -16 (2008). Looking to this Court's recognition in *Hustead v. Ashland Oil Co.,* 197 W.Va 55, 475 S.E.2d 55 (1996), that "there must be an actual, existing controversy" to grant relief under the Act, the trial court concluded that the predicate justiciable controversy was absent with regard to the 1991 Contract. *Id.* at 61, 475 S.E.2d at 61.

In deciding there was no active controversy between the Board and VALIC with regard to the 1991 Contract, the trial court relied upon carefully-crafted factual findings.[20] Illustrative of this point is the myopic focus by the trial court on the Board's failure to "demand immediate cash surrender of the electing teachers' assets in June 2008 or thereafter."[21] Only by applying a hyper-critical lens to this case can that statement be viewed as veracious; critically, the implication that the Board never sought a cash surrender is not.[22] What the record in this case reveals is that on March 14, 2008, the Governor, who is a Board

---

[20]According to the petitioners, the summary judgment orders under review were both prepared by the respondent's counsel and adopted verbatim by the trial court.

[21]By June 2008, the requisite percentage of votes had been cast by the electing DCP participants to join TRS pursuant to West Virginia Code §§ 18-7D-3, -5, -7.

[22]According to the deposition testimony of Anne Lambright, the Board's Executive Director, a phone call was made from the governor's office to Jim Coppedge, informing him of the dollar amount of the surrender being requested and the number of participants involved. Additional evidence of this request is provided in an email from Mr. Coppedge, dated June 29, 2008, written to Ms. Lambright. *See infra* note 28.

member,[23] held a meeting at the state capitol with VALIC representatives and various legislative leaders. That meeting, which took place just two days before the passage of House Bill 101, was held to explore VALIC's response to the legislation's anticipated passage. Upon being presented with this information, Mr. Coppedge, as general counsel for AIG Retirement, indicated that an $11.5 million dollar surrender charge would be imposed. Three days after this meeting and the passage of the authorizing legislation, Mr. Coppedge continued to assert VALIC's right to assess a multi-million dollar surrender charge "in the event that all assets were cashed out in the same year."[24]

Although VALIC eventually agreed that the policy prevented the imposition of a surrender charge, another impediment to the immediate withdrawal of these funds arose when VALIC declared that the requested withdrawal was subject to a five-year restriction.[25] Looking for a way to avoid this fund-release limitation, the petitioners decided to transfer the funds from the 1991 Contract into a bond fund option within the DCP– the American Funds. The parties were in agreement that the terms of the endorsement permitted a transfer of

---

[23]*See* W.Va. Code § 5-10D-1(b).

[24]Because numerous participants elected to stay in the DCP, all of the assets were never cashed out of the 1991 Contract. At present, $50 million in assets remain invested under the 1991 Contract for DCP members.

[25]VALIC relied on the language of the endorsement that addresses an annual 20 percent limitation "in the case of a withdrawal for transfer to another funding entity." The petitioners maintain that the conditions for invoking this limitation are nonexistent.

9

funds from the annuity to this particular investment without restrictions. The contemplated transfer failed to occur when the American Funds refused to accept the large investment. At this point, months after the transfer to TRS was to have been accomplished,[26] the petitioners relented with regard to its attempt to remove the funds from VALIC in toto and agreed to place the funds in another VALIC annuity–the 2008 Contract.[27]

In view of the numerous communications between VALIC and the petitioners in regards to effecting removal of the subject funds from the 1991 Contract, there is little doubt that VALIC, while fully apprised of the petitioners' objective to acquire those funds in aggregate fashion, acted in direct response to that specific request.[28]  Hence, the trial court's hinging of its ruling on the absence of a cash demand by the Board in June 2008 or later is nothing more than a red herring. Assuming, *arguendo*, that no demand was in fact

---

[26]The petitioners note that one aspect of the transfer of the DCP funds to the TRS was accomplished by putting those funds into the hands of the IMB (making IMB a party in lieu of the Board to the 2008 Contract), the trustee statutorily charged with investing TRS funds. *See* W.Va. Code §§ 12-6-3(a), -9a(a) (2014).  The physical "movement" of these funds did not begin until May 5, 2009, with the first installment transfer to IMB, and ended with the last transfer of funds from VALIC to the IMB in May 2013.

[27]The petitioners maintain that the creation of the 2008 Contract as a funding vehicle for the DCP members electing to transfer into TRS was VALIC's idea.

[28]Through email correspondence dated June 29, 2008, Jim Coppedge, Senior Vice President and General Counsel for AIG Retirement, wrote to Anne Lambright, the Board's Executive Director:  "I am writing to follow up on a request that we received from Great West [DCP plan administrator] late last week to transfer $237 Million in assets from the VALIC Group Fixed Annuity Contract offered through the Plan. . . ."

made,[29] the lack of demand in June 2008 or later was clearly linked to VALIC's vacillating position that such a release of funds would either cost $11.2 million or be subject to specified per annum limits. Given the ongoing motivation of the Board to act consistent with its fiduciary responsibilities,[30] the lack of a demand at this particular point in time was necessarily impelled by the need to limit the costs associated with removal of those funds.

Returning to the issue of whether an active controversy existed between the Board and VALIC regarding the Board's entitlement to an immediate surrender without fees or restrictions under the 1991 Contract, we revisit the nature of a justiciable controversy. Integral to the maintenance of a declaratory judgment action is the existence of a live "case." Instructive of this requirement, we have stated: "Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes. *The pleadings and evidence must present a claim of legal right asserted by one party and denied by the other before jurisdiction of a suit may be taken.*" *Mainella v. Board of Trustees of Policemen's Pension or Relief Fund*, 126 W.Va. 183, 185-86, 27 S.E.2d 486, 487-88 (1943) (emphasis supplied). Clarification of legal rights and obligations before a party is forced to act upon those rights and obligations is the ideal which the Act seeks to promote. *See Cox v. Amick*, 195 W.Va.

---

[29]While we are not resolving the factual determination of whether a cash demand was made by the Board in June 2008 or later, we observe that the overly-constrained manner in which the trial court framed and ruled on the issue of a demand suggests that such a demand may have been made at some point by some entity.

[30]*See supra* note 12.

11

608, 618, 466 S.E.2d 459, 469 (1995) (Cleckley, J., concurring). The crux of the actual controversy requirement, however, is that the facts must be known and existing at the time of the filing of a declaratory judgment proceeding and the rights and obligations at issue cannot have been previously adjudicated. *See Hustead*, 197 W.Va. at 61-62, 475 S.E.2d at 61-62.

We adopted the following four-pronged test in syllabus point four of *Hustead* to assist judges with the identification of a justiciable controversy:

> In deciding whether a justiciable controversy exists sufficient to confer jurisdiction for purposes of the Uniform Declaratory Judgment Act, West Virginia Code §§ 55-13-1 to -16 (1994), a circuit court should consider the following four factors in ascertaining whether a declaratory judgment action should be heard: (1) whether the claim involves uncertain and contingent events that may not occur at all; (2) whether the claim is dependent upon the facts; (3) whether there is adverseness among the parties; and (4) whether the sought after declaration would be of practical assistance in setting the underlying controversy to rest.

*Id.* at 56, 475 S.E.2d at 56. Application of these factors demonstrates that a justiciable controversy existed at the time the petitioners filed their complaint against VALIC.

In this case, there is no concern that the matter at issue– the petitioners' attempt to resolve their right to an immediate and aggregate removal of the annuity funds–is a contingent event. As the facts of this case demonstrate, the removal of the subject funds has

12

been accomplished. What has yet to be determined, however, is whether the petitioners had the right to the immediate withdrawal of those annuity funds, free of temporal or quantitative restrictions. Consequently, the relevant adverseness still exists between the parties and the declaration of rights sought by the petitioners is required to put this controversy to rest.

Seeking to circumvent the existence of a justiciable controversy, VALIC posits that the Board never asserted its right to an aggregate release of the electing DCP members' funds. *See State Farm Mut. Auto Ins. Co. v. Schatken*, 230 W.Va. 201, 211, 737 S.E.2d 229, 239 (2012) (finding declaratory relief improper based on insurer's failure to plead contractual provision upon which it relied for claimed right to reimbursement and failure to assert right to reimbursement pre-suit). As evidence of the Board's failure to seek a lump sum payout, VALIC asserts that the necessary paperwork to complete a withdrawal of the subject funds was supplied to, but never returned by, Great-West Retirement Services ("Great West"), the third-party administrator of the DCP. The record of this case amply demonstrates why the "Transition Information Form" supplied to Great West for processing the fund release was not returned to VALIC. By completing and submitting the form, the Board would have been agreeing to a five-year payout of the requested funds. At this point in the process, the Board was simply unwilling to act in accordance with VALIC's interpretation of the 1991

13

Contract.[31] Importantly, the fact that the paperwork necessary to process the Board's demand for funds was not returned to VALIC does not evidence the failure of the Board to seek such a payout under the facts of this case. All it proves is that the Board, fully aware of the financial consequences of a cash demand based on VALIC's position and its control of the subject funds, was seeking to find an alternate way to gain full access to the necessary funds without the attendant imposition of fees or withdrawal restrictions.

Our review of the record compels us to conclude that the trial court erred in finding that VALIC had not denied any right asserted by the Board under the 1991 Contract. That finding is clearly tied to the circuit court's acceptance of VALIC's argument that the Board never requested a cash payout under the 1991 Contract. Only by turning a blind eye to the events that transpired in this case can it even be suggested that the Board failed to assert its claimed right to an aggregate payout of the subject funds. VALIC cannot expect this Court, or any court for that matter, to believe that the statutory objective of gaining access to the funds of the electing DCP members was not adequately articulated by the Board in a manner that VALIC fully comprehended. On the facts of this case, the Board's failure to submit the form authorizing the withdrawal of funds is simply not determinative of whether the Board previously asserted its right to a lump sum payout. Moreover, unlike the

---

[31]By failing to submit the form, VALIC argues that the Board was "tacitly agreeing that the withdrawal restriction applied to the transfer." We find this statement to be self-serving and unsupported by the record.

14

situation in *Schatken*, the pleadings of this case fully evidence that the Board asserted its right to an immediate demand of the subject funds without fees or restrictions from the initial filing of this case in May 2009.

In clear contrast to the circuit court, we find that the requisite assertion of a legal right by one party and the denial of that right by another party to a declaratory judgment action has been demonstrated. *See Board of Educ. v. Board of Public Works*, 144 W.Va. 593, 601, 109 S.E.2d 552, 557 (1959). VALIC's actions in response to the Board's unmistakably clear and statutorily-mandated objective of removing the corpus of the electing DCP members' funds[32] constituted the necessary controversy to proceed under the Act.[33] *See Robertson v. Hatcher*, 148 W.Va. 239, 247, 135 S.E.2d 675, 681 (1964) ("'The controversy between the plaintiff and the defendant is actual, existing and justiciable in the sense that the defendant has made evident his purpose to enforce provisions of the statute and that such enforcement will directly and materially affect the rights of the plaintiff.'") (internal citation omitted). That controversy has yet to be resolved. *See Mainella*, 126 W.Va. at 186, 27

---

[32]VALIC's sophistic suggestion that the statutory mandate was met when the 2008 Contract was created and IMB was given "control" of the funds is decidedly wrong. As long as the funds remained with VALIC, IMB lacked the ability to utilize those moneys for the benefit of the TRS system as a whole and, correspondently, it had no ability to increase the return on the investment.

[33]As noted above, every investment provider other than VALIC transferred the assets of the electing DCP members without restriction or penalty in accordance with the Board's instructions. *See supra* note 19.

S.E.2d at 488 (recognizing need for resolution through declaratory judgment of former policeman's right, that had been partially denied, to pension or restoration to active duty). Accordingly, we reverse the trial court's finding that no justiciable controversy exists between the Board and VALIC with regard to the 1991 Contract.[34]

## 2. Standing – 2008 Contract

Similar to its handling of the 1991 Contract, the trial court resorted to cherry-picked facts and resulting summary conclusions to rule that the Board has no standing to assert relief in connection with the 2008 Contract. Intentionally minimizing the Board's role as a trustee of TRS, the circuit court reasoned that the Board lacked the requisite standing to be a party to any proceeding involving the 2008 Contract.[35] For the reasons stated below, we find this conclusion both erroneous and specious.

In VALIC's vision of the trustee position that the Board occupies in relation to the IMB, the Board is nothing but a check issuer. Overlooked by VALIC is both statutory and case law recognizing the significance of the Board's role as a trustee of this state's

---

[34]Although we find it unnecessary to address at length the trial court's conclusion that the Board cannot establish it suffered harm in connection with the 1991 Contract, we are unpersuaded by VALIC's contention that the issuance of the 2008 Contract fully eliminates the issue of harm to the Board. Whether the Board can demonstrate damages arising from the 1991 Contract has yet to be established.

[35]The parties to the 2008 Contract were the IMB and VALIC.

16

various retirement funds. The Board is expressly charged to "administer all public retirement plans in this state." W.Va. Code § 5-10D-1(a). By law, the Board "has all the powers, duties, responsibilities and liabilities of the Public Employees Retirement System . . . ; the Teachers Retirement System . . .; the Teachers' Defined Contribution System. . . . " *Id.* at § 5-10D-1(d).

Contending that the Board is a mere payment processor while the IMB is the actual investor of TRS funds, VALIC maintains that the Board lacks the requisite significant interest in the 2008 Contract to be a party to any dispute arising from that contract. *See* Syl. Pt. 1*, Shobe v. Latimer*, 162 W.Va. 779, 253 S.E.2d 54 (1979) (recognizing existence of standing for persons with significant interests who are directly injured or adversely affected by governmental action under Uniform Declaratory Judgements Act). The indefensibility of these arguments is easily demonstrated. The Legislature both envisioned and empowered the Board to be more than a distributor of retirement checks. In designating the Board as a trustee for all the state's retirement plans, the Legislature expressly accorded the Board "all the powers, duties, responsibilities and liabilities" of each of those plans. W.Va. Code § 5-10D-1(d). Inherent to the legislative reposition of trust in the Board is "a fiduciary duty to protect the fund[s] and the interests of all beneficiaries thereof" which requires that "it must exercise due care, diligence, and skill in administering the trust." Syl. Pt. 14, in part,

17

*Dadisman v. Moore*, 181 W.Va. 779, 384 S.E.2d 816 (1988).[36]  As a further means of ensuring proper oversight of this state's public retirement funds, the Legislature mandated that members of the Board "shall have recognized competence or significant experience in pension management or administration, actuarial analysis, institutional management or accounting."  W.Va. Code § 5-10D-1(b).

The extent of the Board's fiduciary duty to its members has previously been recognized by this Court:

> The fiduciary duty of the Consolidated Public Retirement Board established by *W.Va. Code*, 5-10D-1 [1998] and its members, with respect to the public employee pension funds and assets entrusted to the Board, includes the affirmative duty to monitor and evaluate the effect of legislative actions that may affect such funds and assets, *and to take all necessary actions including initiating court proceedings if necessary to protect the fiscal and actuarial solvency of such funds and assets*."

Syl. Pt. 2, *State ex rel. Deputy Sheriff's Assoc'n v. Sims*, 204 W.Va. 442, 513 S.E.2d 669 (1998) (emphasis supplied).  As we acknowledged in *Sims*, the Board has a responsibility as "'financial prognosticator and micromanager'" to "use the court system to protect the rights

---

[36]Although this holding of *Dadisman* addressed the authority of the Public Employees Retirement System Board, the same principles equally apply to the Consolidated Public Retirement Board as it replaced the PERS Board upon its creation in 1991. *See State ex rel. Deputy Sheriff's Ass'n v. Sims*, 204 W.Va. 442, 448, 513 S.E.2d 669, 675 (1998) ("The affirmative duty of the Board to act . . . in an informed, proactive and independent manner to perform its fiduciary duty is no less now than it was when *Dadisman* was decided.").

18

of the beneficiaries of the funds held in trust by the Board." *Id.* at 448, 513 S.E.2d at 675 (internal citation omitted).

Seeking to nullify the significance of the Board's role as a trustee of TRS, VALIC places undue emphasis on the IMB's duty to provide "prudent fiscal administration, investment and management for the funds of" TRS. W.Va. Code § 12-6-3(a) (2014). Critically, the IMB's duty to invest TRS funds does not extinguish the fiduciary role that the Board occupies as a trustee of TRS. *See* W.Va. Code § 5-10D-1(a). Inherent to the Board's continued role as a statutory trustee is its responsibility to act consistent with its legislatively-imposed duty to protect the funds of TRS as well as the interests of the TRS beneficiaries. *See* W.Va. Code § 12-6-7 (2014) (recognizing continued status, power,[37] and duties of public agencies and boards with respect to retirement funds upon creation of IMB); *Dadisman*, 181 W.Va. at 782, 384 S.E.2d at 819, syl. pt. 14.

As the amicus curiae[38] correctly observes, the Board and the IMB "serve crucial roles that are inextricably intertwined as they relate to the retirement assets at issue." We agree. The Legislature has charged both the Board and the IMB to protect the retirement

[37]Among those continued powers is "the right to sue and be sued, plead and be impleaded, contract and be contracted with and . . . make all necessary rules and regulations to carry out the provisions of this article [7A]." W.Va. Code § 18-7A-4 (2012).

[38]Specifically, the American Federation of Teachers–West Virginia, AFL-CIO.

19

assets of public education employees. As part of their duties as trustees, the petitioners serve as the legal representatives of the participants in the subject retirement plans. In bringing the subject action in tandem, the petitioners acted consistent with their public charge to protect the assets of the public education employees whose retirement depends upon the fiscal soundness of TRS. Had the IMB brought this action on its own, it is likely that the Board would have been required to intervene as a necessary party. *See Mainella*, 126 W.Va. at 188, 27 S.E.2d at 488 (recognizing need for joinder of necessary parties to fully adjudicate merits of pension-related matter).

Consequently, we are unpersuaded by VALIC's attempt to discount the Board's role as a trustee of TRS. While the Legislature established the IMB as an independent public body corporate, it did not create a body authorized to act without review or oversight. *See* W.Va. Code § 12-6-1a(b) (2014) (recognizing need for "independent board with its own full-time staff of financial professionals, immune to changing political climates, in order to provide a stable and continuous source of professional financial management"). This is evident from the fact that the IMB is statutorily required to provide the Board with monthly and quarterly performance reports. W.Va. Code § 12-6-6(b), (c) (2014). Of further significance is the Legislature's decision not to eliminate or reduce the powers and duties the Board had with regard to TRS when it adopted legislation pertaining to the IMB. *See* W.Va. Code §§ 12-6-7, 5-10D-1(d). The legislative creation of the IMB as a public body corporate

20

for investment purposes was designed as "the best means of assuring prudent financial management of these [retirement] funds under rapidly changing market conditions and regulations." W.Va. Code § 12-6-1a(e). Equally evident, however, is the fact that the statutes imbuing the IMB with investment authority do not abrogate the Legislature's reposition of trust in the Board with regard to the state's public retirement plans. Finally, it cannot be ignored that the Board is one of the entities charged with ensuring that the IMB meets its objective of administering, investing, and managing TRS in a fiscally prudent fashion. *See* W.Va. Code §§ 12-6-3(a), -6.

By choosing to dichotomize the relief awarded based upon the signatories to the respective annuity contracts, the trial court engaged in a misadvised manner of evaluating the issues presented in this case. While the annuity agreements are contractual in nature, those contracts were formed for a specific governmental purpose–the investment of public employees' retirement funds. In view of this uncontroverted public purpose–a purpose that entails both asset administration and protection–the signatory status of IMB to the 2008 Contract is simply not determinative of the Board's interest in that annuity contract. As we discussed above, the Board has "all the powers, duties, responsibilities and liabilities" of TRS. W.Va. Code § 5-10D-1. And, as a statutory trustee of TRS, the Board in its fiduciary role has the inherent authority "to take all necessary actions including initiating court proceedings if necessary to protect the fiscal and actuarial solvency of such funds and

21

assets." *Sims*, 204 W.Va. at 443, 513 S.E.2d at 670, syl. pt. 2, in part. Therefore, we wholly reject VALIC's attempt to remove the Board as a party to the controversy surrounding the 2008 Contract.

Rather than constituting precedent for the Board's lack of standing, as VALIC contends, this Court's decision in *Shobe* demonstrates the exact converse. Addressing the nature of the interest necessary to proceed under the Act, we concluded in *Shobe* that a group of plaintiffs had standing under the Act to obtain relief with regard to riparian rights allegedly affected by a contract between two governmental entities. Repudiating the considerations that typically prevent third-parties from obtaining a declaration of rights regarding a contract between private citizens, we explained that "there is a logical nexus between the status plaintiffs in error assert and the contract claim sought to be adjudicated."[39] 162 W.Va. at 787, 253 S.E.2d at 59. In discussing the distinction between standing and the case or controversy test for assessing a justiciable controversy, we recognized that standing involves "'the question [of] whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.* at 787, 253 S.E.2d at 59-60 (quoting *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970)). Looking to the

---

[39]As we explained in *Shobe*, "[b]ut for the contract the diversion [of water] would not be taking place." 162 W.Va. at 787, 253 S.E.2d at 59.

remedial purposes of the Act, this Court expressly rejected the requirement that to proceed under the Act, a party must have a personal legal right or interest. *See Shobe,* 162 W.Va. at 788, 253 S.E.2d at 60 and syl. pt. 2.

Under the reasoning of *Shobe,* the laws charging the Board with the duties and responsibilities of being a trustee of this state's public retirement plans establish the requisite "zone of interests" for the Board to seek a declaration of rights with regard to the 2008 Contract. To conclude otherwise, as we observed in *Shobe,* "would be contrary to the express purpose and spirit of the [Declaratory Judgments] Act." *Id*. at 787, 253 S.E.2d at 59. With the objective of setting this issue to rest, we hold that, as a statutory trustee of this state's public retirement funds, the Consolidated Public Retirement Board has standing to bring an action under the Act to resolve disputes arising from investment-related contracts that involve public retirement funds, irrespective of whether it is a party to such contracts. Accordingly, we reverse the trial court's finding that the Board lacks standing in relation to seeking and obtaining a declaration of rights and/or relief under the 2008 Contract.[40]

---

[40]Not only is the trial court's finding that the Board has not suffered any damages related to the 2008 Contract premature, but we further reject its conclusion that the Board was not impacted by any lost return on investments during the relevant time period. As the personal representative of TRS, the Board was an interested party necessarily affected by any losses that can properly be demonstrated to arise from the annuity contracts at issue.

23

## B. Adverse Ruling Against IMB

## 1. Standing and Damages - 1991 Contract

Just as it framed its award of relief to VALIC against the Board based on the individual annuity contracts, the trial court proceeded similarly in granting relief to VALIC against IMB. With regard to the 1991 Contract, the circuit court narrowly framed the issue as being controlled by the signatories to the contract. For many of the same reasons we discarded VALIC's arguments regarding the Board's right to seek relief under the 2008 Contract,[41] we find VALIC's attempt to corral the relief and the parties with regard to the 1991 Contract to be similarly unavailing.

As an initial observation, we note the irony inherent to VALIC's position that the IMB has no standing to seek relief concerning the 1991 Contract. In regards to the 2008 Contract, VALIC purposefully sought to elevate the role the IMB occupies as trustee of TRS charged with investing TRS assets compared to the "purely administrative" role the Board fills. Having thus cast the IMB as the paramount trustee in view of its statutory charge to invest TRS assets and its attendant responsibility for realizing returns on those investments, VALIC now seeks to paint the IMB out of the investment picture with regard to the 1991 Contract. This construct does not withstand analysis.

---

[41]*See supra*, Section III.A.2.

VALIC argues that the IMB "does not have any, much less a significant or substantial, interest in the 1991 Contract." In making this argument, VALIC relies upon the fact that the Board, rather than the IMB, is charged with making investments for the DCP. If the issues surrounding the 1991 Contract were limited to enforcing those contractual terms for purposes of the non-electing DCP participants, VALIC's position might resonate more convincingly. Rather than maintaining investments subject to the 1991 Contract, however, the subject proceedings were initiated by the petitioners to secure the withdrawal of those funds. As the trustee charged with investing TRS assets, the IMB had a statutory mandate to timely obtain the funds of those DCP members who elected to join TRS. *See* W.Va. Code §§ 18-7D-5, -7. "[O]nce the transfer legislation was enacted," as VALIC acknowledges, "the transferring teacher's funds belonged to the TRS."

Given that the underlying action was instituted to obtain funds that the IMB was statutorily charged to invest, the IMB had a clear right to join the Board in seeking a declaration of rights as to the 1991 Contract. *See* W.Va. Code §§ 12-6-9a., 18-7D-5. The IMB, like the Board, was acting on behalf of the public employees participating in TRS. Apparently lost on VALIC is the fact that the IMB was not seeking to enforce rights arising from a private contract, but rights emanating from a contract designed for the purpose of public employees and their beneficiaries. Consequently, we have no difficulty in finding that the IMB properly acted pursuant to its statutory grant of powers to "[s]ue and be sued" when

25

it jointly instituted the subject suit with the Board.  W.Va. Code § 12-6-5 (2014).

Further evidence of error arises from the trial court's ruling that VALIC's issuance of the 2008 Contract necessarily eliminated any harm that the IMB may have suffered related to the 1991 Contract.  Just as we rejected this finding with regard to the Board's inability to establish damages arising from the 1991 Contract,[42] we similarly view this related conclusion as baseless.  Whether the IMB can establish that it incurred damages as a direct result of its failure to obtain the assets of the electing DCP members in aggregate fashion remains to be proven.  It is not, however, a foregone conclusion as the trial court suggests.  Rather than having a preclusive effect, the issuance of the 2008 Contract is integrally linked to whether the IMB can demonstrate injury arising from the 1991 Contract.[43] Accordingly, we reverse the trial court's finding that the IMB lacks standing in relation to seeking and obtaining a declaration of rights and/or relief under the 1991 Contract.

## 2.  Withdrawal Restrictions - 2008 Contract

Turning to the crux of the substantive dispute between the parties, we consider the trial court's rulings that pertain to the endorsement that is a part of both the 1991 and the 2008 Contract.  As the trial court found, the "withdrawal restriction" contained in each of

---

[42]*See supra* note 34.

[43]But for the position VALIC took with regard to the endorsement contained in the 1991 Contract, the 2008 Contract would not have been issued.

26

the two contract endorsements are worded identically.  In relevant part, the endorsement provides as follows:

> Section 2.03 (Surrender Value) is amended by adding the following:
>
> A) Except as provided in (B) below, *in the case of a withdrawal for transfer to another funding entity only 20% of the Surrender Value may be withdrawn once a year.*
>
> A Participant may choose to have the Surrender Value withdrawn for transfer in one of the following ways:
>
> > (1) Five Year Equal Annual Installment Method.  The interest rate during the five year payout period will be declared in advance by VALIC.  No other withdrawals may be made once payments begin.
> >
> > (2) Decreasing Balance Method.  1/5 of the account balance the first year.  1/4 of the remaining balance the second year.  1/3 of the remaining balance the third year.  1/2 of the remaining balance the fourth year.  The entire remaining balance the fifth year.  Interest under this method will be credited at a rate determined by VALIC.  Withdrawals may be made under this method.
>
> B)  *The 20% a year restriction does not apply if:*
>
> > (1) The Surrender Value remaining would be less than $500, or;
> >
> > (2) The *withdrawal is for transfer to the funding entity for the West Virginia ORP Common Stock Fund or the West Virginia ORP Bond Fund.*
>
> Section 3.02 is deleted.  *There will be no surrender charges under this Contract.*  The account Surrender Value is equal to the Annuity Value.  (emphasis supplied).

27

In reaching its finding that the endorsement is unambiguous, the trial court intentionally omitted any consideration of documents that were incorporated as part of the 1991 Contract.[44] That omission is critical to a proper understanding of the meaning of the disputed endorsement language. Consequently, our review of the trial court's ruling pertaining to the endorsement to the 2008 Contract impels a discussion of the 1991 Contract and its formation. In further explanation, we note that the 2008 Contract was created to be "materially similar (i.e., form, endorsements, rates, and terms)" to the 1991 Contract,"[45] and documents expressly incorporated into the initial annuity contract arguably address the parties' intentions with regard to the subject endorsement language.

### a. 1991 Contract

The 1991 Contract is comprised of four documents: the Request for Proposal issued by the Board,[46] VALIC's submitted proposal, the October 15, 1991, Letter of Understanding ("1991 Letter of Understanding"), and the annuity policy issued to the Board as amended by the endorsement. The Request for Proposal provides:

Each participant will choose his/her own investment options

---

[44]VALIC's strategy to exclude any consideration of the 1991 Contract with regard to the meaning of the endorsement is clear from both the structure of the summary judgment rulings as well as the bifurcation of the relief awarded.

[45]*See supra* note 14 and accompanying text.

[46]The Request for Proposal provided that both "[t]he Request for Proposal and the accepted proposal will be incorporated into the contract."

from options that the Board will provide. Each participant may invest in one or more of these funds in multiples of 20% and they may change options at the end of each quarter as well as changes in their current balance. There shall be no charge or surrender charge of any transfer from one account to another.

Responding to the Board's response for information relative to six specified examples, VALIC provided the following in its submitted proposal:

Example #5: Male employee joins plan at age 30, ten years later elects to transfer his entire balance from the annuity option account to one of the other investment options.

An employee may reallocate any percentage of his/her contribution to another option without restriction. Additionally *a participant may transfer 100% of his/her V-Plan account balance to the Common Stock Fund or the Bond Fund at the end of each quarter. 20% of the participant's accumulated account balance can be transferred to either the Money Market Fund or the Investment Contract once per year.* This condition is necessary in order for VALIC to invest in a manner to support the interest rates offered under the V-Plan contract. (emphasis supplied)

Further addressing the issue of withdrawal from the VALIC annuity, James J. Costello, Vice President of VALIC, and James L. Sims, Acting Executive Secretary of the Board, agreed in the 1991 Letter of Understanding: "VALIC will allow a participant to withdraw his or her investments at any time without penalty, subject to the twenty percent annual limitation if funds withdrawn are to be deposited into money market fund or income fund which consist of guaranteed investment contracts."

29

### b. Ruling Regarding Endorsement to 2008 Contract

Turning to the language of the endorsement, we recognize that it concerns three separate issues, only two of which are germane to the present dispute. The first matter addressed is the amendment of Section 2.03, which pertains to surrender value, and the second subject of the endorsement is the deletion of Section 3.02–both of which are quoted in full above. Since the parties are in agreement that no surrender charges apply, the issue that the trial court purportedly considered was whether there was any ambiguity in the language of the endorsement as it pertained to surrender value. Without any significant discussion of the terms included in the amendments to Section 2.03,[47] the trial court simply declared that the subject language lacked ambiguity. In marked contrast to the trial court, we are not convinced that the terms used in the amended Section 2.03 of the endorsement are either unambiguous or capable of application without reference to the documents that were included as part of the 1991 Contract.

In a calculated effort to exclude from its consideration any of the documents that comprised the 1991 Contract, the trial court decided that the only documents relevant to its interpretation of the 2008 Contract were the 2008 Contract and a Letter of Understanding

---

[47]With no analysis of what qualified as "another funding entity," the trial court summarily concluded that VALIC's transfer of funds to the Short Term Fixed Income Pool in December 2008, at the IMB's request, constituted "'another funding entity' for purposes of the Endorsement."

("2008 Letter of Understanding") from Craig Slaughter, the Executive Director of the IMB, to Jim Coppedge. Given the manner in which the 2008 Contract came into existence–as an investment vehicle for funds invested in the 1991 Contract upon VALIC's disallowance of the aggregate removal of those funds–and the representation by AIG's senior vice president and general counsel that the 2008 Contract would be "materially similar" to the 1991 Contract with express reference to "form, endorsements, rates, and terms," we would be hard pressed to wholly disregard evidence that may relate to the meaning of the endorsement language in dispute.

While declaring the subject endorsement to be unambiguous, the trial court violated the well-established tenet of insurance and contract law that precludes reference to extrinsic evidence to prove the meaning of unambiguous terms. *See Larew v. Monongahela Power Co.*, 199 W.Va. 690, 694, 487 S.E.2d 348, 352 (1997) ("The parol evidence rule . . . generally prohibits the introduction of any extrinsic evidence to vary or contradict the terms of written contracts [.]"). In this case, the trial court included what clearly constitutes parol evidence in finding that "VALIC would not have entered into the 2008 Contract had it not included the withdrawal restriction contained in the Endorsement." This statement, attributed to Mr. Coppedge in the trial court's ruling, clearly goes outside the four corners of the two documents the trial court identified as defining the rights of the parties with regard to the 2008 Contract.

31

The petitioners argue that the amended language of Section 2.03 governing surrender value is not applicable under the facts of this case. As support for their position that no withdrawal restrictions were invoked, the petitioners look to the terms employed in the endorsement and VALIC's past practice of permitting participants to have full and immediate access to their funds when surrender was requested.[48] Looking at the phrase "withdrawal for transfer to another funding entity," the petitioners maintain that the funding entities encompassed within this endorsement language were the fund providers to whom the DCP plan participants were permitted to transfer their funds subject to the annual 20 percent limitation imposed on money market and guaranteed investment contracts. The endorsement simply reflects the very terms insisted upon by the Board with regard to permitting and encouraging DCP participants to regularly assess and move their retirement funds between the various investment options provided. This is clear, argue the petitioners, from a review of the language of Section 2.03 which fully comports with VALIC's submitted proposal[49] by removing the 20 percent restriction from transfers that are made to the West Virginia ORP Common Stock Fund or the West Virginia ORP Bond Fund. And, it similarly interfaces with VALIC's Example #5, quoted above, as part of its submitted proposal. The petitioners insist

_____

[48]Based on limited legislative windows provided for opting out of DCP and into TRS, DCP participants were previously permitted by VALIC to withdraw their funds from the 1991 Contract with no temporal or quantitative restrictions in 1995 and 2001.

[49]In its proposal, VALIC provided: "An employee may reallocate any percentage of his/her contribution to another [investment] option without restriction. Additionally, a participant may transfer 100% of his/her V-PLAN account balance to the Common Stock Fund or the Bond Fund at the end of each quarter."

32

that the endorsement's withdrawal restrictions were solely intended to apply to transfers that were made to other investments included within the DCP plan. In contrast, surrenders that involved the participants' outright removal of their funds from the DCP were not subject to any restriction under the annuity policy other than a possible six-month delay in payment following a request for funds.[50]

Because VALIC prepared the endorsement at issue, the petitioners correctly observe that any ambiguities in that document are required to be construed against VALIC and in their favor. *See* Syl. Pt. 4, *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987) ("It is well settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured."). In deciding whether an ambiguity exists, this Court has held: "Whenever the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous." Syl. Pt. 1, *Prete v. Merchants Prop. Ins. Co.*, 159 W.Va. 508, 223 S.E.2d 441 (1976). And, in those cases where uncertainty or ambiguity exists regarding the construction of the terms used in a written instrument, evidence of

---

[50]The delay in payment is authorized by Section 6.08 of the annuity contract, which permits VALIC to defer payment of any partial or total surrender for up to six months.

custom or usage may be considered.[51]  *See* Syl. Pt. 5, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E.2d 626 (1962).

VALIC insists that the condition necessary to invoke the subject endorsement occurred when IMB requested that VALIC transfer all of the funds in the 2008 Contract to the Short Term Fixed Income Pool on December 18, 2008.  In this Court's opinion, the issue of whether the terms of the endorsement were even applicable to this full surrender request by the IMB is far from clear.  Upon our considered examination of the record in this case, we are convinced that the language in the endorsement pertaining to "a withdrawal for transfer to another funding entity" is decidedly ambiguous.   In light of our determination that the endorsement language under review is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, we reverse the trial court's decision

---

[51]When the 1991 Annuity became unallocated (specific funds no longer attributable to specific participants) in the late 1990s, VALIC submits that this policy alteration impacted the endorsement to permit the operation of the withdrawal restrictions on a group rather than an individual level.  The withdrawals that occurred following the change to an unallocated policy, according to VALIC, simply did not involve sufficient funds to require application of the withdrawal restrictions.  While we need not decide this issue, we observe that the lack of any separate documentation (other than self-serving statements announcing VALIC's position) which evidences a clear, bargained for limitation may make this position untenable. *See Cabot Oil & Gas Corp. v. Huffman*, 227 W.Va. 109, 117, 705 S.E.2d 806, 814 (2010) (recognizing that "courts are not at liberty to, *sua sponte*, add to or detract from the parties' agreement").  We further note that a statutory definition of what constitutes an "unallocated annuity contract" may further call VALIC's position into question. *See* W.Va. Code § 33-26A-5(25) (2011) (excepting from definition of unallocated annuity any annuity contract where annuity benefits are guaranteed).

that the endorsement is unambiguous and its related conclusion that the 2008 Contract and Letter of Understanding restricted the IMB's requested withdrawal from the 2008 Contract on December 18, 2008.

## IV.  Conclusion

Based on the foregoing, the decision of the Circuit Court of Kanawha County to grant summary judgment to VALIC through its orders entered on October 21, 2013, is reversed.  Given the admitted complexity of the issues presented in this case and the prior request of the petitioners to transfer this matter to the Business Court Division,[52] we are granting that request and accordingly direct the circuit court to promptly transfer this case to the Business Court Division for further proceedings consistent with this opinion.

Reversed with directions.

---

[52]*See* W.Va. T.C.R. 29.06.