IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

_____

No. 17-0486

_____

**FILED**

**June 5, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

THE WEST VIRGINIA INVESTMENT MANAGEMENT BOARD, a public body corporate, and THE WEST VIRGINIA CONSOLIDATED PUBLIC RETIREMENT BOARD, a public agency,
Plaintiffs Below, Petitioners

v.

THE VARIABLE ANNUITY LIFE INSURANCE COMPANY,
Defendant Below, Respondent

_____

Appeal from the Business Court Division
The Honorable Christopher C. Wilkes, Judge; The Honorable Joanna I. Tabit, Judge; and
The Honorable Paul T. Farrell, Judge
Civil Action No. 09-C-2104

AFFIRMED

_____

Submitted: May 16, 2018
Filed: June 5, 2018

Benjamin J. Bailey, Esq.
Jonathan R. Marshall, Esq.
Thomas B. Bennett, Esq.
Raymond S. Franks, II, Esq.
BAILEY & GLASSER LLP
Charleston, West Virginia
Counsel for Petitioner
The West Virginia Investment
Management Board

J. Jeaneen Legato, Esq.

Thomas J. Hurney, Jr., Esq.
Michael M. Fisher Esq.
JACKSON KELLY PLLC
Charleston, West Virginia

Erin R. Stankewicz, Esq.
JACKSON KELLY PLLC
Wheeling, West Virginia

Richard J. Doren, Esq. (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP

Consolidated Public Retirement Board

Gerard R. Stowers, Esq.
Special Assistant Attorney General
J. Mark Adkins, Esq.
S. Andrew Stonestreet, Esq.
BOWLES RICE LLP
Charleston, West Virginia
Counsel for Petitioners

Andrew J. Katz, Esq.
Charleston, West Virginia
Counsel for *Amicus Curiae*
West Virginia Education Association

Jeffrey G. Blaydes, Esq.
Carbone & Blaydes, P.L.L.C
Charleston, West Virginia
Counsel for *Amicus Curiae*
American Federation of Teachers,
   WV AFL-CIO

Robert M. Bastress, Jr., Esq.
Morgantown, West Virginia
Counsel for *Amicus Curiae*
West Virginia Association of Retired
   School Employees
West Virginia Employment Lawyers
   Association

Los Angeles, California
Counsel for Respondent

John M. Canfield, Esq.
Charleston, WV
Counsel for *Amicus Curiae*
West Virginia Chamber of Commerce

Mychal S. Schulz, Esq.
Babst Calland
Charleston, West Virginia
and
Todd A. Mount, Esq.
Shaffer & Shaffer, PLLC
Madison, West Virginia
Counsel for *Amicus Curiae*
Defense Trial Counsel of West Virginia

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE DAVIS concurs and reserves the right to file a concurring opinion.

SYLLABUS BY THE COURT

"Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

WALKER, Justice:

This appeal is the latest chapter in a long-existing contractual dispute between the West Virginia Investment Management Board (IMB), the West Virginia Consolidated Public Retirement Board (CPRB) (together, Petitioners) and the respondent, The Variable Annuity Life Insurance Company (VALIC). The first time the parties were before this Court, we reversed summary judgment in favor of VALIC and remanded for further proceedings.[1] This Court also directed that the matter be referred to the Business Court Division. Eventually, the parties agreed to submit the dispute to binding, non-appealable arbitration before a panel of three business court judges due to the complexity of the case. The panel unanimously found in favor of VALIC. Petitioners now contend that the creation and makeup of the arbitration panel was illegal. Petitioners additionally argue that the panel, even if validly created, misapplied the law in reliance on erroneous findings of fact, altogether failed to apply the law of the case created in *IMB I*, and neglected to decide all issues before it.

We disagree and find that the Business Court Division Rules provide sufficient flexibility to allow for arbitration by panel if agreed to by the parties. Because the parties were sophisticated and represented by able counsel, we find no cause to void the parties' agreement to submit the matter to binding arbitration, including their agreement

---

[1] *West Virginia Investment Management Bd. v. Variable Annuity Life Ins. Co.*, 234 W. Va. 469, 766 S.E.2d 416 (2014) (*IMB I*).

to waive appellate review. While we disagree with the characterization of Petitioners' merits-based arguments as challenges to the panel's subject-matter jurisdiction, we nonetheless find Petitioners' arguments that the panel failed to apply the law of the case and neglected to decide all issues before it unavailing. Accordingly, we affirm the order below dismissing the matter from the Business Division docket in reliance on the conclusions reached in the panel's Final Decision.[2]

## I.     FACTUAL AND PROCEDURAL BACKGROUND

As we did when this case was previously before this Court in *IMB I*, we again find it necessary to provide the appropriate background for the proceedings at issue, despite that the substantive facts are of little use to our analysis in the current appeal because it delves into matters of constitutionality and the legality of the procedures employed below. In *IMB I*, we explained history of the teachers' retirement plans and the 1990 legislation affecting those plans:

> The State Teachers Retirement System ("TRS") was created in 1941 to provide retirement benefits for public school teachers and other school service personnel. From 1941 to 1970, teachers and other professional and school service personnel were required to participate in TRS. While originally a defined contribution plan, TRS became a defined

---

[2] This Court would like to acknowledge the participation of *amici curiae* in this case. Briefs in support of Petitioners were filed by the West Virginia Education Association, the American Federation of Teachers, as well as the West Virginia Association of Retired School Employees and West Virginia Employment Lawyers Association. Briefs in support of Respondent were filed by the West Virginia Chamber of Commerce and the Defense Trial Counsel of West Virginia.

benefit plan in 1970. Due to funding problems affecting the solvency of TRS, the Legislature enacted the "Teacher's Retirement Reform Act" ("Reform Act") in 1990, pursuant to which a defined contribution plan ("DCP") was created. *See* W. Va. Code §§ 18–7B–1 to –21 (2012 & Supp. 2014). Subject to the provisions of the Reform Act, participants were permitted to allocate their retirement funds among various investment options in the DCP.[3]

So, on October 8, 1991, the CPRB entered into an annuity contract with VALIC to offer DCP enrollees a high-yield, fixed annuity investment. The 1991 Contract provided that VALIC would guarantee a minimum annual interest rate of at least 4.5% in perpetuity, and contained an endorsement providing that "in the case of withdraw for transfer to another funding entity only 20% of the Surrender Value may be withdrawn once a year" (the 20% Rule). Application of the 20% Rule was subject to only two exceptions: (1) the surrender value remaining would be less than $500; or (2) the withdrawal is for transfer to the funding entity for the West Virginia ORP Common Stock Fund or the West Virginia ORP Bond Fund. In March 2008, the Legislature passed House Bill 101, which, effective July 1, 2008, permitted DCP members to elect to transfer their retirement funds from DCP to TRS if at least sixty-five percent of the total DCP membership opted to do so.[4] Seventy-eight percent of the members opted to transfer their funds to TRS. Because the threshold requirement had been met, the State requested liquidation of the investments

---

[3] *IMB I*, 234 W. Va. at 472-73, 766 S.E.2d at 419-20.

[4] *See generally* W. Va. Code §§ 18–7D–1 to –12 (2008).

3

of the transferring members from all DCP fund providers, including VALIC. VALIC invoked the 20% Rule and agreed, in accordance with that rule, that it would transfer 20% of the funds each year over a five-year period, or, in the alternative, would agree to a fee of $11.2 million for an immediate withdrawal of the full amount.

This issue prompted discussions between CPRB, IMB, and VALIC, during which a transfer of the funds to a bond fund option (as an exception to the 20% Rule) was contemplated, but ultimately failed because IMB could not agree to the bond fund's requirements. The parties then negotiated a new contract in November 2008 (the 2008 Contract). VALIC received assurances that the 2008 contract was "not an attempt by the CPRB or IMB to liquidate the assets in the new fixed annuity contract." The parties agreed that the 2008 Contract would be "materially similar (i.e., form, endorsements, rates, and terms) to the [1991] contract issued to the CPRB for the [DCP]." The 2008 Contract did, however, designate IMB as signatory.[5] Critically, the 20% Rule was not altered in any way from the 1991 Contract to the 2008 Contract. On December 10, 2008, Petitioners requested that VALIC transfer $248 million from the fund governed by the 1991 Contract to one governed by the 2008 Contract. Eight days later, IMB requested withdrawal of all funds held under the 2008 Contract on or before December 21, 2008. Pursuant to the 20% Rule, VALIC again refused to allow withdrawal of the full $248 million in one lump sum, but

---

[5] CPRB and IMB are co-trustees and fiduciaries of the TRS. IMB dictates how those funds are invested while CPRB acts in more of an administrative capacity. For those who did not elect to transfer to the TRS, CPRB is the sole administrator and fiduciary.

agreed to transfer 20% per year over a five year period.[6]  Petitioners filed this action initially seeking only a declaratory judgment that VALIC was required to pay the amount in a lump sum rather than in five equal installments over the period of 2009 to 2013.  After removal and remand from federal court, however, Petitioners amended their complaint to seek damages in the form of "lost investment opportunities," claiming that had they been permitted to withdraw all of the funds in a lump sum, they could have made a greater rate of return than VALIC's guaranteed 4.5% interest.

The parties filed cross-motions for summary judgment.  VALIC argued, among other things, that the suit with regard to the 1991 Contract did not present a justiciable controversy, and the CPRB did not have standing to assert relief in connection with the 2008 Contract.  Petitioners argued, among other things, that the 20% Rule endorsement should be construed in their favor.  The circuit court granted VALIC's motion for summary judgment, finding that Petitioners presented no justiciable controversy, and determined that the 20% Rule endorsement was unambiguous and should be construed in favor of VALIC.  Accordingly, the circuit court entered summary judgment in favor of VALIC.  Petitioners then appealed that order to this Court in *IMB I*.

---

[6] VALIC eventually agreed that the contract terms did not provide that it could assess a surrender fee.

5

In *IMB I*, we held that both IMB and CPRB had standing to pursue the action.[7]  And, we held that the suit presented a justiciable controversy.[8]  More important for our review of this appeal, however, we explained that the 20% Rule endorsement language was "decidedly ambiguous."[9]  We reasoned that because the 1991 contract formed the basis of the 2008 contract, which the parties agreed were "materially similar," the circuit court should not have precluded from its review evidence relating to the 1991 contract.[10]  Thus, we reversed the grant of summary judgment and remanded the matter for further proceedings consistent with the opinion.[11]  We also referred the matter to the Business Court Division.[12]

Following the remand in *IMB I*, the parties engaged in extensive discovery that focused on developing parol evidence consistent with this Court's directive.  The additional discovery included written discovery, affidavits, and seven additional depositions.  The deponents included the CPRB executive director who participated in negotiations for the 1991 Contract, VALIC's former chief actuary, CPRB's Executive

[7] *IMB I*, 234 W. Va. at 481, 766 S.E.2d at 428.

[8] *Id.* at 477, 766 S.E.2d at 424.

[9] *Id.* at 485, 766 S.E.2d at 432.

[10] *Id.* at 483-84; 766 S.E.2d at 430-31.

[11] *Id.* at 485; 766 S.E.2d at 432.

[12] *Id.*

6

Director from 2003 to 2005, and CPRB's Rule 30(b)(7) witness.[13]  Most relevant for purposes of this appeal, CPRB's representatives conceded that VALIC could not have guaranteed the 4.5% interest rate if the funds could be withdrawn at any time, in total and without restriction; that no one at CPRB had ever stated the view—prior to this litigation— that the 20% Rule did not apply to the transfers attempted in 2008; and that it had been reported to the CPRB Board upon review of the 20% Rule that the "annuity could only be liquidated through five annual withdrawals over a multi-year period."

Prior to the pretrial conference, Judge Christopher C. Wilkes—the Business Court Division Chair and Presiding Judge—expressed concern, echoed by the parties, that the complexity of the issues involved might prove difficult for resolution by a lay jury.[14] These concerns prompted Judge Wilkes to offer to hold a bench trial or other alternative dispute resolution.  The parties reportedly "liked the idea of arbitration, but worried that

---

[13] Rule 30(b)(7) of the West Virginia Rules of Civil Procedure provides that, upon subpoena, an organization is required to produce for deposition a representative designated to testify as to matters known or reasonably available to the organization.

[14] As discussed below, Petitioners petitioned this Court for a writ of prohibition in conjunction with this appeal, which was denied.  In Judge Wilkes's response to Petitioners' petition for a writ of prohibition, he provided a detailed account of the events and discussions that transpired surrounding the agreement to arbitrate.  Neither party has offered anything to dispute Judge Wilkes's account of the events, and have likewise condoned the writ of prohibition as a complement to, and duplication of, the issues raised in this appeal.  Accordingly, we find it appropriate to include and consider his account since the parties' accounts were more general to the effect that they had agreed to the joint stipulation.  Consequently, Judge Wilkes's response is more instructive as to how the present procedural anomaly came to fruition.

the case presented too much information for one arbitrator to absorb." In response, Judge Wilkes offered to secure a panel of arbitrators to hear their dispute according to whatever terms were agreed upon by the parties. Counsel for the parties sought the possibility of securing three business court judges to serve as the arbitration panel to be conducted the next day, but it could not be arranged on such short notice. Judge Wilkes advised the parties that he would not serve on the panel, but the parties requested that Judge Wilkes do so because he was already intimately acquainted with the admittedly complex issues, having presided over the case for the past year. The parties then took leave to consult with their respective clients and reconvened, at which time all counsel agreed to the alternative dispute resolution and at the parties' request, Judge Wilkes cancelled the jury trial scheduled to begin the following day. The parties then agreed that they would attempt to mediate the case once more, and asked that Judge Wilkes serve as the mediator since he not only was aware of all issues, but also was available to conduct the mediation the following day due to cancellation of the jury trial. In the event that the mediation was unsuccessful, the parties agreed that the matter would be submitted to binding, non-appealable arbitration before Judge Wilkes, and Business Court Judges Joanna I. Tabit and Paul T. Ferrell, who were specifically chosen by the parties. The parties likewise stipulated to detailed parameters for the arbitration. The parties reduced the pertinent points of their agreement to writing and submitted it to the Business Court on September 20, 2016 as a Joint Stipulation:

8

WHEREAS, the parties came to an agreement to stay this action and submit to binding arbitration if they are not able [to] resolve it through mediation;

NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between the parties, as follows:

1. This action will be stayed.

2. The parties have waived their right to trial by jury or bench.

3. The parties shall mediate this dispute before Judge Wilkes on September 20, 2016.

4. In the event the action is not resolved through mediation, the parties shall submit to binding arbitration before a three-judge panel comprise of Judge Wilkes, Judge Joanna I. Tabit, and Judge Paul T. Farrell ("the arbitration"). Any dispute arising prior to the arbitration shall be resolved by Judge Wilkes.

5. The arbitration shall take place over a three-day period that is mutually convenient to the panel members and parties.

   a. On the first day of arbitration, Plaintiffs shall have up to five hours to present a proffer of evidence.

   b. On the second day of arbitration, Defendant shall have up to five hours to present a proffer of evidence.

   c. On the third day of arbitration, both parties shall have up to three hours to present argument.

6. Seven (7) calendar days before the arbitration is scheduled to begin, the parties may submit pre-arbitration memoranda not to exceed twenty-five (25) pages.

7.     At the arbitration, the proffers must be drawn from materials and testimony in the discovery record in the case or publicly available sources.

    a.  In the event a party intends to proffer testimony of a witness that is not in the discovery record, that testimony must be provided by affidavit in advance of the arbitration.

    b.  Any affidavit prepared pursuant to paragraph 6(a), above, shall be served on opposing party by e-mail at least fourteen (14) calendar days before the arbitration is scheduled to begin.

    c.  The opposing party may, at their election, depose any witness whose testimony is presented by affidavit. The deposition shall occur prior to the first date the arbitration is scheduled to begin. The deposition shall be limited to the subject matter of the testimony set forth in the affidavit.

8.     Within fourteen (14) calendar days following the conclusion of the arbitration, the parties may submit written arguments in memoranda not to exceed (thirty) 30 pages in length.

9.     The arbitration panel shall issue a reasoned decision applying West Virginia law within thirty (30) calendar days after the conclusion of the arbitration.

10.     The arbitration shall be confidential, except to the extent disclosure is required by law.

11.     The decision of the arbitrators is final and non-appealable.

12. Upon issuance of the panel's reasoned decision, the above-captioned action shall be dismissed with prejudice.

13. The parties shall bear their own costs, including attorneys' fees.

After entering the parties' Joint Stipulation, Judge Wilkes conducted a mediation, but not before informing the parties that any information they did not wish him to know as a member of the arbitration panel should be kept confidential from him during the mediation. The mediation was unsuccessful and the matter was scheduled on the court's public docket for a three-day arbitration on January 18-20, 2017, but was continued by agreement of the parties to March 7-9, 2017.

Beginning March 7, 2017, the arbitration took place in Kanawha County's Ceremonial Courtroom. Because the arbitration was to take place in a county courthouse, and relating to the parties' agreement that arbitration be confidential, except to the extent disclosure is required by law, Judge Wilkes explained to the parties that "you cannot preclude the public or anyone from . . . observing [the arbitration]. So I think we're not going to be able to blanket much, if anything, in confidentiality." The parties thereafter made their five-hour proffers of evidence to the panel, presented three-hour oral arguments, and submitted post-arbitration written arguments. On April 28, 2017, the panel issued a unanimous Final Decision in favor of VALIC, finding that "the legal conclusion of [the] case rests upon the formation of the December 2008 replacement contract[,]" and after reviewing the parol evidence, negotiating history, and course of performance, it was

11

apparent that all parties (specifically CPRB representatives), at the time of contracting in 2008, shared VALIC's interpretation that the 20% Rule applied to Petitioners' attempted withdrawal unless the transfer was made to the WV ORP Common Stock Fund or the WV ORP Bond Fund. The panel reasoned:

> [a] party (like IMB) that enters into a contract with knowledge of the other party's interpretation is bound by that interpretation and cannot later claim it thought the contract meant something else. *U.S. v. Stuart*, 489 U.S. 353, 368 n.7 (1989) ("It is hornbook contract law that the proper construction of an agreement is that given by one of the parties when 'that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.'" (quoting Restatement (2d) of Contracts § 201(2)(b) (1981)).

The panel determined that Petitioners were not entitled to withdraw the funds in one lump sum without restriction, and therefore were not entitled to damages resulting from alleged lost investment opportunities.

Despite agreeing that the panel's order would be binding and non-appealable, Petitioners then applied to this Court for a writ of prohibition and filed a corresponding and complementary appeal. We denied the writ of prohibition, but address the arguments made therein as they were duplicated in this appeal.

## II. STANDARD OF REVIEW

Determining the legality of the parties' agreement to arbitrate before the Business Court Division requires analysis of the Trial Court Rules and the Rules of Judicial

12

Conduct. Likewise, one aspect of this appeal relates to whether review is proper given Petitioners' agreement to waive appellate review, or whether Petitioners retain that right as a matter of law. Accordingly, our review is plenary. As we have previously held, "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."[15]

## III. ANALYSIS

On appeal, Petitioners argue that the Business Division did not have the authority to conduct an arbitration and that their consent to the arbitration and its terms was ineffective because the proceedings were illegal. As a facet of that argument, Petitioners argue that to deem the proceedings "confidential" was a violation of the public's constitutional right to access to the courts. Petitioners further argue that even if the Business Division did have the authority to conduct an arbitration, and conducted it properly, the panel did not apply West Virginia law because it did not apply the so-called "law of the case" from *IMB I*, nor did it rule on Petitioners' declaratory judgment. Thus, Petitioners argue that the award must be vacated either because the Business Court lacked the authority to conduct an arbitration, because the arbitration, as conducted, violated the West Virginia Constitution, or because the arbitration panel exceeded its jurisdictional

---

[15] Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

13

authority by violating the agreement to arbitrate insofar as it failed to apply West Virginia law as agreed and failed to decide all issues before it.

VALIC counters that Petitioners have waived any procedural objection to the arbitration by agreeing to it below, but argue that, even so, the Business Court Rules provide the framework for conducting an arbitration and the parties' agreement was not "illegal." As to Petitioners' argument that the panel did not apply West Virginia law and did not rule on Petitioners' declaratory judgment claim, VALIC argues that Petitioners have waived appellate review on the merits by agreement and are simply attempting to recast their arguments on the merits in terms of subject-matter jurisdiction to circumvent that agreement.

## A. *Putative illegality of the parties' voluntary arbitration*

Turning first to the Business Division's authority to conduct arbitrations, Petitioners do not dispute that they agreed to arbitrate, nor do they claim fraud or any other untoward inducement to enter into the agreement. Instead, Petitioners claim that their consent to the arbitration, while willingly given, was nevertheless ineffective because it was made toward an illegal purpose. Petitioners argue that because the agreement to arbitrate was made at the eleventh hour prior to trial, they were deprived of the time to research the validity of the alternative dispute resolution to which they were agreeing. And, upon availability of time to further inquire, Petitioners reached the resolute conclusion that the proceedings were illegal.

14

Petitioners' contention is self-serving and flagrantly untrue in light of the fact that Petitioners are not only sophisticated parties represented by highly-qualified counsel, but also because the arbitration did not take place for six months after the agreement to arbitrate was executed. At no point during those six months, during the pendency of the arbitration proceedings, or in submission of their post-arbitration briefs did Petitioners ever take issue with the legal validity of the proceedings. Extraordinarily, Petitioners arrived at their current position that the alternative dispute resolution to which they agreed was unquestionably illegal only after the arbitration panel rendered its decision in favor of VALIC. Not surprisingly, we are disinclined to relieve Petitioners from the self-imposed conditions in the Joint Stipulation on that premise.

Nonetheless, we agree with Petitioners that if the agreement to arbitrate was illegal, the fact that Petitioners agreed to the proceedings is of no consequence.[16] Petitioners' arguments are three-fold. First, Petitioners argue that the Rules of Judicial

---

[16] *See* syl. pt. 2, *Ben Lomond Co. v. McNabb,* 109 W.Va. 142, 153 S.E. 905 (1930) ("A court of equity will not, at the instance of the original parties or others claiming under them, enforce a contract entered into to accomplish a fraudulent or illegal purpose."); *Dorr v. Chesapeake & O. Ry. Co.,* 78 W.Va. 150, 157, 88 S.E. 666, 668 (1916) ("An illegal contract is as a rule void—not merely voidable—and can be the basis of no judicial proceeding. No action can be maintained upon it, either at law or in equity. This impossibility of enforcement exists whether the grant is illegal in its inception, or whether, being valid when made, the illegality has been created by subsequent statute . . . . 'If a contract is tainted with the vice of illegality, it is held to create no obligation, not from any consideration of the individual rights of the parties, who may be equally in fault, but from regard for the public.' Generally, the illegality of a contract is a perfect defense to its enforcement, because the law will not require one to do, or punish him for not doing, that which it forbids him to do." (internal citations omitted)).

15

Conduct preclude Business Division judges from conducting arbitrations. Second, but relatedly, Petitioners argue that the Business Division Rules do not authorize arbitration, generally, and specifically, they do not authorize the makeup of the one impaneled here. Third, Petitioners argue that the confidential nature of the proceedings renders them unconstitutional, and, therefore, void.

Rule 3.9 of the Code of Judicial Conduct states that "[a] judge shall not act as an arbitrator or mediator or perform other judicial functions apart from the judge's official duties." The commentary to that rule provides "[t]his Rule does not prohibit a judge from participating in arbitration, mediation, or settlement conferences *performed as part of assigned judicial duties. . . .*" Trial Court Rule 29.09(h), a specific Business Court Rule, provides that "[t]he Resolution Judge *is authorized to schedule and conduct mediation of the case or any Alternative Dispute Resolution as agreed to by the parties and the Resolution Judge* in an attempt to resolve the case in an expedient and efficient manner." Likewise, Trial Court Rule 29.04(e) defines the Resolution Judge as "[a] member of the Division assigned by order of the Division Chair, with the advice and consent of the Division, to mediate, *arbitrate*, *or provide any other form of dispute resolution agreed to by the parties. . . .*" When read together, it requires no stretch of reasoning to conclude that arbitration, if that is the agreed-upon Alternative Dispute Resolution, falls within the scope of a Business Division judge's official duties, and therefore does not run afoul of Rule 3.9 of the Code of Judicial Conduct.

16

Trial Court Rule 29.09(h) is likewise general enough to imbue the Business Court Division with the authority to conduct an arbitration by panel, if agreed to by the parties and the Resolution Judge. The term "any" within that Rule necessarily includes arbitration by panel as a form of alternative dispute resolution, particularly where the Resolution Judge is given the authority to arbitrate generally under Rule 29.04(e).[17] The Business Division's rules to this end are aimed at flexibility and allow some degree of creativity for resolution of particular types of disputes so long as the creature of that creativity is agreed to by the parties involved.[18] Thus, because we do not find that the Business Division wholly lacked authority to conduct an arbitration by panel or otherwise, there is no cause to conclude that the parties' agreement to do so was "illegal."

---

[17] *See infra* n. 35.

[18] We find no fault in the agreement to submit this matter to arbitration in general, but merely find that the agreement, by its very nature as an *agreement*, and one to arbitrate at that, limits our appellate review. Consistent with the parties' and Judge Wilkes' concerns, our review of the record suggests that this matter was particularly well-suited for arbitration considering the complexity of the issues involved as well as the sheer volume of evidence to be proffered. Business disputes, as contemplated by the creation of the Business Division, often require a departure from the typical civil case structure. As the parties themselves contemplated, arbitration by panel not only provided the parties with three highly-skilled judges to hear their dispute, but likewise allowed the parties to more capably present their cases through an agreed-upon structure unavailable to litigants in civil cases. The parties here were enabled to present their evidence as they saw fit in five hour blocks in order to serve cohesive factual development, were provided *three hours* of legal argument, and were permitted to submit written legal arguments prior to and at the close of the arbitration for consideration. Where the legal arguments are complex, the often-crippling time limitation of closing arguments to a jury cannot be understated, and these parties had the foresight to contract around that limitation.

More troubling are the manifold roles of Judge Wilkes as the Presiding Judge and Resolution Judge, as well as his ultimate position on the arbitration panel in light of Trial Court Rule 29.07, which provides that "the Division Chair may serve as a Presiding *or* Resolution Judge."[19]  Here, Division Chair Judge Wilkes began the case as the Presiding Judge and thereafter mediated the case and served on the arbitration panel as the Resolution Judge.  The rules inform us that the policy behind having two separate judges assigned to these tasks is in effort to protect the confidentiality of mediation, and, for that reason, communication between the two is limited: "[t]o protect the confidentiality of the mediation process, communication between the presiding judge and the resolution judge regarding the mediation during or after the process shall be limited to procedural status *or other matters agreed to by all parties*."[20]  It is clear from the language of Rule 29.04(e) that the parties may agree to full disclosure of information as between the presiding and resolution judges, and that the parties in this case agreed to just that.  For that reason, we see no illegality in the makeup of the arbitration panel so as to void the proceedings.

Moreover, the matter before us is not the archetypal waiver issue arising from the parties' failure to lodge an objection: the parties here *explicitly agreed* that Judge Wilkes would mediate the case and then serve on the arbitration panel.  Indeed, the parties *asked* Judge Wilkes to mediate the case, and later *asked* him to serve on the arbitration

---

[19] Emphasis added.

[20] W. Va. Tr. Ct. R. 29.04(e) (emphasis added).

18

panel after he offered to impanel three new judges. Judge Wilkes further informed the parties that any information they did not wish him to know as a member of the arbitration panel should not be presented to him during the mediation. Given these circumstances, we find that the policy implications of dual roles as presiding judge and resolution judge have been rendered moot by agreement of the parties and the proceedings are not rendered void or illegal for that reason. Further, we find that Petitioners, again by virtue of their agreement, cannot now be heard to complain of the makeup of the panel.

Turning to Petitioners' argument that the arbitration was unconstitutional because it violated the public's constitutional right to access the courts,[21] we find that argument ill-suited to the actual circumstances of the arbitration conducted below. As discussed by Petitioners, the Court of Appeals for the Third Circuit examined this issue in *Delaware Coalition for Open Government, Inc. v. Strine*.[22] In *Strine*, the Third Circuit struck down a Delaware statutory scheme relating to private, court-sponsored arbitration.[23]

---

[21] *See* W. VA. CONST. art 3, § 17 ("The courts of this state shall be open[.]").

[22] 733 F.3d 510 (3d Cir. 2013).

[23] *Strine*, 733 F.3d at 521. *But see, Strine*, 733 F.3d 510 (Fuentes, J., concurring) ("The crux of today's holding is that the proceedings set up by § 349 violate the First Amendment because they are conducted outside the public view, not because of any problem otherwise inherent in a Judge-run arbitration scheme. . . . Nothing in today's decision should be construed to prevent sitting Judges of the Court of Chancery from engaging in arbitrations without those confidentiality provisions."). *See also*, *Strine*, 733 F.3d 510 (Roth, J., dissenting) ("[The majority opinion] looks "'not to the practice of the specific public institution involved, but rather to whether the particular *type* of government proceeding [has] historically been open in our free society.'" . . . [h]istorically, arbitration has been private and confidential. Logically, the resolution of complex business disputes,

The *Strine* court reasoned that because the arbitrations were conducted in state courthouses by officials elected by the public, to preclude the public from the proceedings was a violation of the well-instilled constitutional right to access the courts.[24] Petitioners argue that pursuant to *Strine*, the parties' agreement that the proceedings would be confidential was unconstitutional and the award should be vacated. We find *Strine*'s theoretical arguments with regards to the rights of the public persuasive, and, indeed, this Court has also reiterated that "[o]ne fundamental aspect of our Anglo-American system of justice is its openness," and "[w]ith respect to any judicial or quasi-judicial proceeding, the public must always be afforded the opportunity to realize that there is a careful, reasoned and judicious decision-making process at work[.]"[25] In application to the underlying proceeding, however, the facts in this case are utterly distinct from those in *Strine*, and the outcome necessarily different.

In *Strine*, the Delaware statutory scheme barred public access by providing that the proceedings could only be attended by the parties and their representatives, and

---

involving sensitive financial information, trade secrets, and technological developments, needs to be confidential so that the parties do not suffer the ill effects of this information being set out for the public—and especially competitors—to misappropriate. For these reasons, there is here no First Amendment right of public access.") (internal citations omitted).

[24] *See id.* at 513-14.

[25] *Daily Gazette Co., Inc. v. Comm. on Legal Ethics of the W. Va. State Bar*, 174 W. Va. 359, 364; 368, 326 S.E.2d 705, 710; 714 (1984) (internal quotations and citations omitted).

that the petition for arbitration and supporting documents would not be included on the public docketing system.[26]  In stark contrast, the date, time and location of the parties' arbitration proceedings below were publicly docketed by the court as they would be in any other civil case, and transcripts of the arbitration were available to the public.  While the Final Decision was issued under seal, it was unsealed by this Court, and Petitioners do not allege that members of the public ever sought to review the Final Decision and were denied.  Likewise, as Judge Wilkes aptly noted prior to the arbitration, "you cannot preclude the public or anyone from  . . . observing [the arbitration].  So I think we're not going to be able to blanket much, if anything, in confidentiality."  Petitioners do not allege, nor is there any evidence in the record to suggest that anyone was precluded from observing the arbitration.  Rather, Petitioners contend that "[t]he hearing was held in the Kanawha County Courthouse, but it was not publicized and it was not attended by the public or press, though the transcript of the three-day proceeding has been placed on the public docket."  Seemingly, Petitioners conflate the concepts of publicity and public access.  The constitutional right of the public to access the courts requires that the courts be open as a check on the judiciary; it does not require that the court actively provide publicity for already publicly-docketed proceedings, nor does it require actual attendance of the press or the public.  Accordingly, we view the parties' agreement to keep matters confidential to the extent allowable by law as little more than an agreed protective order, ultimately

---

[26] *Strine*, 733 F.3d at 513.

21

rendered moot when this Court unsealed the record. For those reasons, we do not find that the proceedings violated the constitutional right to access the courts.

## B.     *Availability of appellate review*

Having determined that the arbitration, as conducted, was not "illegal" so as to void the agreement of the parties, we turn next to the availability of appellate review. As discussed above, the parties agreed that the arbitration would be "binding" and "non-appealable." Consequently, VALIC argues that appeal to this Court is altogether foreclosed. Petitioners, by contrast, argue that the issues raised in the appeal are ones relating to subject-matter jurisdiction, which the parties cannot agree to waive.[27] Petitioners further contend that there is no such thing as "binding judicial arbitration" because "judicial arbitration, in jurisdictions offering it all, appears to be uniformly of the non-binding variety."[28]

---

[27] *See, e.g.*, *State ex rel. Smith v. Thornsbury*, 214 W. Va. 228, 233, 588 S.E.2d 217, 222 (2003) ("[s]ubject-matter jurisdiction may not be waived or conferred by consent and must exist as a matter of law for the court to act.").

[28] Petitioners argue in their reply brief that there are aspects of public policy that suggest that sitting judges should not act as arbitrators. Initially, we observe that the cases on which Petitioners rely analyze other states' statutory schemes or rules relating whether a judge may, within the confines of those statutes or rules, conduct arbitration. As we have already established, this state's framework for the Business Court Division does not preclude arbitration by business court judges. As to general public policy, first, Petitioners argue that sitting judges may not act as arbitrators because *private* arbitration cannot be conducted in public courthouses without running afoul of constitutional access to the courts. As we have previously discussed, this was not a private arbitration and the public was not precluded access. Second, Petitioners argue that sitting judges may not act as

22

Addressing Petitioners' initial argument as to whether judicial arbitration may be binding by agreement of the parties, we readily dismiss it. Petitioners cite to the following states' court-annexed arbitration schemes as authority for the proposition that judicial arbitration is uniformly non-binding because the state statutes or rules that create that form of dispute resolution afford the parties the right to appeal by trial de novo: Ariz. Rev. Stat. § 12-133 (2012) (neutral arbitrators and right of appeal with trial de novo); Fla. Stat. § 44.103 (2007) (same); Haw. Rev. Stat. § 601-20 (2000) (non-binding arbitration with neutral arbitrators); Ill. S. Ct. R. 86-87, 93 (neutral arbitrators with right of appeal); Nev. Rev. Stat. 38.250 (2005), Nev. Arb. R. 7, 18 (same); N.C. Gen. Stat. § 7A-37.1 (2013) (same); R.I. Super. Ct. Arb. R. 2, 5 (neutral arbitrators and right of appeal with trial de novo); Wash. Rev. Code § 7.06040-.050 (2011) (same).

A closer review of those statutes and court rules reveals that there is one glaring and consequential difference between the arbitrations conducted under those schemes and the one conducted here: the arbitration conducted in this case was not

arbitrators because arbitrators need not adhere to the Rules of Evidence or other facets of West Virginia law, which conflicts with the duties of an elected judge. But, pursuant to their agreement, and as discussed below, the panel *did* apply West Virginia law. Third, Petitioners argue that judicial arbitrators should not be permitted to "wear both hats," that is, to hear in their judicial capacity grounds for vacating the awards they rendered in their capacity as an arbitrator. This argument is moot on the facts of this case, however, because Petitioners never made such motion to vacate the award below. Thus, Petitioners raise these public policies in the abstract, but has not alleged that any of those public policies were at stake or violated here. Consequently, we find those arguments unavailing under the current factual circumstances.

mandatory.[29]  Arizona, Florida, Hawaii, Illinois, Nevada, North Carolina, Rhode Island, and Washington have, by statute or court rule, court-annexed arbitration.  Those states *require* that when certain conditions are met,[30] the parties arbitrate their disputes.  Accordingly, appeal by trial de novo is a constitutional prerequisite to such mandatory arbitration so as to preserve the right to a jury trial.  When examining its statutory scheme, Arizona's courts have discussed that "[t]he right to trial *de novo* is essential to the constitutionality of *compulsory* arbitration, since both the United States and Arizona Constitutions guarantee the right to trial by jury."[31]  Likewise, in defending the constitutionality of its court-annexed arbitration, Hawaii's courts have discussed

> the United States Supreme Court has stated that the seventh amendment "does not prescribe at what stage of an action a trial by jury must, if demanded, be had; or what conditions may be imposed upon the demand of such a trial, consistently with

---

[29] We note that Petitioners also cite to New Jersey's court-annexed arbitration scheme, N.J. Stat. § 2A;23A-1, *et seq.* (1987) (APDRA), as providing parties to an arbitration with the right of appeal, but not by trial de novo.  Consonant with the facts of this case, New Jersey's arbitration scheme may be voluntarily invoked by agreement of parties to an already-existing dispute. It provides for limited appellate review, *see* N.J. Stat. § 2A:23A-13, but as New Jersey courts have discussed, "[a]lthough limited judicial review is a central component of the APDRA, the APDRA's procedures are entirely voluntary, and thus, parties are free to invoke its procedure *in toto* or subject to agreed upon modifications."  *Weinstock v. Weinstock*, 871 A.2d 776 (N.J. Super. Ct. 2005) (internal quotations and citations omitted).  Petitioners likewise cite Tennessee's voluntary, non-binding ADR scheme (Tenn. S. Ct. R. 31) in support of their argument.  However, Appendix B of those rules permits parties to "stipulate[] in writing that the award shall be final and binding." *See Tuetken v. Tuetken*, 320 S.W.3d 262 (2010).

[30] In most of these states, these requirements typically center on a given dollar amount in controversy, or particular types of litigants.

[31] *Valler v. Lee*, 949 P.2d 51, 53 (Ariz. Ct. App. 1997) (footnote omitted) (emphasis added).

24

perserving the right to it." [*Kimbrough v. Holiday Inn*], 478 F.Supp. at 569 (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 23, 19 S.Ct. 580, 589, 43 L.Ed. 873 (1899)). Thus, with regard to mandatory arbitration programs that afford a right to trial *de novo,* it has been held that:

> [t]he only purpose of the [seventh amendment] is to secure the right of trial by jury before rights of person or property are *finally* determined. All that is required is that the right of appeal for the purpose of presenting the issue to a jury must not be burdened by the imposition of onerous conditions, restrictions or regulations which would make the right practically unavailable.[32]

North Carolina, too, in its enacting legislation, provided that the constitutional right to a jury trial be preserved through appeal by trial de novo:

> (a)     The General Assembly finds that *court-ordered*, nonbinding arbitration may be a more economical, efficient and satisfactory procedure to resolve certain civil actions than by traditional civil litigation and therefore authorizes *court-ordered* nonbinding arbitration as an alternative civil procedure, subject to these provisions.
>
> (b)     The Supreme Court of North Carolina may adopt rules governing this procedure and may supervise its implementation and operation through the Administrative Office of the Courts. *These rules shall ensure that no party is deprived of the right to jury trial and that any party dissatisfied with an arbitration award may have trial de novo*.[33]

---

[32] *Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Haw. 494, 513, 880 P.2d 169, 188 (1994) (finding that *mandatory* arbitration program was constitutional because it provides for a trial de novo).

[33] N.C. Gen. Stat. Ann. § 7A-37.1 (emphasis added).

While preserving the availability of right to appeal by trial de novo, all of these states require affirmative conduct or reservation of the right to appeal by trial de novo in the course of the parties' mandatory arbitration. Here, just the opposite occurred: the parties were not subject to mandatory arbitration, but rather willingly entered into a contractual agreement to resolve their dispute through arbitration and explicitly waived their right to a trial by jury or bench and to subsequent appellate review.

Petitioners' reliance on these foreign authorities is further undercut because Petitioners do not argue that in these jurisdictions the parties may not agree to waive appellate review altogether as the parties did here. To the contrary, many of these jurisdictions offering court-annexed arbitration appear to honor the agreement of the parties to limit or otherwise preclude appellate review, whether waiver is contemplated in the court-annexed arbitration framework itself or is provided for under the applicable arbitration statutes. [34]

---

[34] *See, e.g.*, 16 A.R.S. Rules of Civil Procedure 77(e) (providing that parties may stipulate that arbitration award entered be binding upon parties thereby precluding appellate attack on award except as provided in arbitration act); N.C. R. ARB 9 (parties may consent to limit issues considered on appellate review; parties may consent in writing to rescind demand for trial de novo); *Darcy v. Lolohea*, 886 P.2d 759, 763 (Haw. Ct. App. 1994) (court review of arbitration award limited by provisions of arbitration statute); R.I. Super. Ct. R. Arb. 1(b) ("Arbitration by Agreement. The court may submit any other civil action to arbitration under these Arbitration Rules or any modification thereof, pursuant to agreement by the parties approved by the court provided that the parties agree in writing that the award shall be binding."); *Valler*, 949 P.2d at 53 ("*[A]bsent a stipulation by the parties*, the resulting arbitration award is nonbinding if a timely appeal is filed." (emphasis added)); *Cozzolino v. Cozzolino*, No. A-4770-10T1, 2012 WL 6097090 (N.J. Super. Ct.

It follows, then, that while we find the foreign authority advocated by Petitioners inapposite, we must still consider the validity of the parties' agreement to "binding, non-appealable" arbitration under West Virginia law. In the absence of Business Court Division Rules outlining any specific procedure concerning appellate review, or otherwise, for arbitrations conducted in the Business Court Division,[35] consistent with the parties' arguments invoking the provisions therein, we apply the West Virginia Revised Uniform Arbitration Act (the Act).[36]

West Virginia Code § 55-10-6(a) provides that "[e]xcept as otherwise provided in subsections (b) and (c) of this section, a party to an agreement to arbitrate or to an arbitration proceeding may waive or the parties may vary the effect of the requirements of this article to the extent permitted by law." Applicable to these circumstances is subsection (c), which dictates what provisions of the Act may be waived when the agreement to arbitrate is entered after a controversy has arisen.[37] Subsection (c),

---

App. Div. Dec. 10, 2012) (precluding appellate review where parties agreed to waive right to appeal arbitration award).

[35] Trial Court Rule 29.09 provides that "[i]f these Rules conflict with other rules or statutes, these rules shall apply[.]" While we do not wish to hamstring the creativity of the Business Division within the currently liberal framework of the Business Court Rules, it is apparent from the issues raised in this appeal that, at least in the context of arbitrations, litigants and courts would benefit from additional rulemaking pursuant to Rule 29.05(c).

[36] *See* W. Va. Code § 55-10-5(a) (2016 Repl. Vol.) ("This article governs an agreement to arbitrate made on or after July 1, 2015.").

[37] *Compare* W. Va. Code § 55-10-5(c), *with* W. Va. Code § 55-10-5(b).

27

in relation to appellate review, indicates that the parties may not vary the effects of West Virginia Code § 55-10-22 (party may move arbitrator to modify or correct an award); West Virginia Code § 55-10-24 (party may move court for confirmation of award if no grounds to modify, correct or vacate award); West Virginia Code § 55-10-25 (party may move court for vacation of award if limited circumstances are met); or West Virginia Code § 55-10-26 (party may move court to modify or correct an award).[38]  Subsection (c) does not, however, preclude the parties from waiving appellate review to this Court under West Virginia Code § 55-10-30.

This is consistent with the general view relating to the language of an agreement in which parties agree to final, non-appealable arbitration:

> And generally, a contract provision stating that arbitration is "non-appealable" signifies that the parties to the contract may not appeal the merits of the *arbitration*; not that the parties agree to waive a right to appeal the district court's judgment confirming or vacating the arbitration decision. *See Tabas v. Tabas*, 47 F.3d 1280, 1288 (3d Cir.1995) (en banc) (observing that, where a contract provided for "final, binding, and non-appealable" arbitration, the Court must adhere to the arbitration decision on the merits); *see also Rollins, Inc. v. Black*, 167 Fed.Appx. 798, 799 n. 1 (11th Cir. 2006) ("[A 'binding, final, and non-appealable' arbitral award] simply means the parties have agreed to relinquish their right to appeal the merits of their dispute; it does not mean the parties relinquish their right to appeal an award resulting from an arbitrator's abuse of authority. . . .").[39]

---

[38] W. Va. Code § 55-10-5(c).

[39] *Southco, Inc. v. Reell Precision Mfg. Corp.*, 331 F. App'x 925, 927 (3d Cir. 2009).

Stated differently,

> "an arbitration agreement . . . between two sophisticated business parties, each represented by counsel, that clearly precludes judicial review of an arbitration award beyond the trial court level, is enforceable." *Supra*, 394 N.J.Super. at 257 (emphasis added). We explained that just as parties may expand review of an arbitration award by contract, they may also "privately contract to further constrict the scope of limited judicial scrutiny by, for instance, eliminating the added layer of appellate review altogether." *Id.* at 265. "The only caveat is that their intention to do so must be clear and unequivocal." *Ibid.* (internal quotation marks and citation omitted). We also recognized that in "rare circumstances" private restrictions on judicial review would not be upheld, citing as an example a no-appeal clause prohibiting review by the trial court. *Id.* at 266.[40]

Accordingly, we find that by virtue of the agreement that the arbitration would be "final, and non-appealable" these sophisticated parties, both represented by counsel, have waived the right to appellate review of the merits under West Virginia Code § 55-10-30. Given that Petitioners never moved under West Virginia Code §§ 55-10-22, -24, -25 or -26 to modify, correct or vacate the award below, our review would be particularly inappropriate. However, insofar as Petitioners argue that the matter is reviewable by couching their merits-based arguments in terms of subject-matter jurisdiction for the panel's alleged failure to apply the law of the case in *IMB I* and failure to rule on issues before it, we find it necessary to review those arguments.

---

[40] *Cozzolino*, 2012 WL 6097090, at *6 (citing *Van Duren v. Rzasa-Ornes*, 394 N.J. Super. 254 (App. Div. 2007), aff'd o.b., 195 N.J. 230 (2008).

Petitioners initially argue that the arbitration panel did not fulfill its charge to make a final and definite award because it did not address Petitioners' request for declaratory judgment and, by not deciding all of the issues submitted to it has ceded jurisdiction over the entire dispute. As a consequence, Petitioners argue that the award must be vacated. We easily dispose of Petitioners' assertion that the panel neglected to decide all issues before it because it did not rule on Petitioners' declaratory judgment. Petitioners' sought a declaration as to whether there could be transfers outside the DCP without restriction. By virtue of the fact that the panel determined that "[b]efore 2008, every CPRB representative that evaluated the 1991 Contract agreed that the 20% [Rule] would apply to any mass withdrawal by the State" and concluded that the 20% Rule applied, that issue was answered in the negative, rendering the point moot.

Relating to the alleged failure of the panel to apply the law of the case, Petitioners refer to *IMB I* as "dispositive" and conclude that the panel's Final Decision (which was not in their favor) was rendered without subject-matter jurisdiction because it did not comply with this Court's legal conclusions in *IMB I*.[41] In particular, Petitioners take issue with the panel's finding that "the legal conclusion of [the] case rests upon the

_____

[41] Although the Business Division unquestionably had subject-matter jurisdiction over the dispute by order of this Court, Petitioners' arguments to this end are grounded in the authority that an arbitrator's subject-matter jurisdiction is derived from the parties' agreement, which, in this case, provided that the panel would make a reasoned decision applying West Virginia law. Thus, Petitioners' contend that the panel ignored *IMB I*, and, therefore, acted without subject-matter jurisdiction.

formation of the December 2008 replacement contract[,]" while *IMB I* emphasized the 1991 Contract.

In *IMB I*, we reversed the circuit court's grant of summary judgment, having found that the circuit court erred in accepting VALIC's argument that there was no justiciable controversy, which was premised on the finding that the CPRB never requested a cash payout under the 1991 Contract.[42]  Likewise, we determined that the circuit court erred in finding that the endorsement language was unambiguous.[43]  Its finding that the endorsement was unambiguous prompted the circuit court to preclude review of the documents incorporated as part of the 1991 Contract, which we felt "*arguably* address[ed] the parties' intentions with regard to the subject endorsement language[,]" since the 2008 Contract was intended by the parties to be "materially similar" to the 1991 Contract.[44]

So, having found that the 2008 Contract was "decidedly ambiguous," we discussed that "we would be hard pressed to *wholly disregard* evidence that *may* relate to the meaning of the endorsement language in dispute."[45]  While we cited with favor the notion that ambiguities should be construed against the drafter (VALIC, in this case), we

---

[42] *IMB I*, 234 W. Va. at 477, 766 S.E.2d at 424. *See also*, *infra* n. 50.

[43] *IMB I*, 234 W. Va. at 485, 766 S.E.2d at 432.

[44] *Id.* at 482-83, 766 S.E.2d at 429-30 (emphasis added).

[45] *Id.* at 484, 766 S.E.2d at 431.

likewise recognized that "in those cases where uncertainty or ambiguity exists regarding the construction of the terms used in a written instrument, evidence of custom or usage may be considered."[46] Consistent with those findings, we determined that summary judgment was not appropriate and remanded the matter for further proceedings with instructions that the case be transferred to the Business Court Division.[47]

Notwithstanding the obvious caveat that *IMB I* was postured as an appeal from summary judgment,[48] having closely compared the panel's Final Decision and *IMB I*, we reject Petitioners' argument that the Final Decision somehow departs from our decision in *IMB I*. In *IMB I*, we were of the opinion that the 2008 Contract provision was ambiguous and could benefit from examination of the 1991 Contract formation, extrinsic

[46] *Id.* at 484-85, 766 S.E.2d at 431-32. *See also*, *Marson Coal Co. v. Ins. Co. of State of Pa.*, 158 W. Va. 146, 150, 210 S.E.2d 747, 750 (1947) (Contra proferentem construction principle should not be applied to "contravene the intention of the parties."); *Cline v. Rose*, 96 Ohio App. 3d 611, 615 (1994) ("When interpreting ambiguous contracts, courts must make a legitimate attempt, after hearing the relevant parol evidence, to determine the intent of the contracting parties."); *Urban Assoc., Inc. v. Standex Electronics, Inc.*, No. 04-CV-40059, 2012 WL 1079720 (E.D. Mich. March 30, 2012) ("[t]he general rule of construing an ambiguous contract against the drafter does not mean automatically holding in favor of the other party. . . . Otherwise, extrinsic evidence would be irrelevant." (citations omitted)).

[47] *IMB I*, 234 W.Va. at 485, 766 S.E.2d at 432.

[48] "A trial court's denial of a motion for summary judgment, or an appellate court's decision to overturn the granting of such a motion, does not reflect an opinion on the ultimate merits of the case. . . . The final verdict in a case should be the result of the proof offered by the parties. . . ." *McGinnis v. Cayton*, 173 W. Va. 102, 312 S.E.2d 765 (1984) (citations omitted).

evidence, and custom and usage. For the circuit court to have precluded that evidence from its review at the summary judgment stage was error. We are still of that opinion.

Upon remand and extensive additional discovery relating to the 1991 Contract and further evidence as to custom and usage, the panel, being in possession of all such evidence not before this Court in *IMB I*,[49] concluded that whatever the parties' intent was at the formation of the 1991 Contract, Petitioners entered into the 2008 Contract with the absolute knowledge and understanding that VALIC also interpreted the 20% Rule as applicable to the withdrawals Petitioners were attempting to make. Further, Petitioners effectively conceded, and evidenced by conduct that they also held the view that the 20% Rule applied to the attempted withdrawals prior to entering the 2008 Contract,[50] and were

---

[49] *See, e.g.*, *Feesers, Inc. v. Michael Foods, Inc.*, 591 F.3d 191, 207-08 (3d Cir. 2010) (law of the case inapplicable where the "full record established at trial . . . was not available to this Court when we decided [the] appeal from summary judgment"); *Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 879-80 (9th Cir. 2002); *Stagl v. Delta Air Lines, Inc.*, 117 F.3d. 76, 79-80 (2d Cir. 1997).

[50] Petitioners cherry-pick portions of *IMB I* taken out of context in support of its argument that this Court effectually decided the case in its favor in *IMB I*: "[o]nly by turning a blind eye to the events that transpired in this case can it even be suggested that the Board failed to assert its claimed right to an aggregate payout of the subject funds." Quoted from our discussion relating to whether a justiciable controversy existed, Petitioners misapply it to interpretation of the contract, i.e., contending that this Court had determined that VALIC was aware that IMB held a different interpretation of the applicability of the 20% Rule to the withdrawals. To the contrary, this Court discussed that VALIC was aware of IMB's *objective* to withdraw the funds, which, in part, created the justiciable controversy, and, in fact, lends itself to the conclusion reached in the Final Decision.

33

therefore bound to that interpretation consistent with contract law.[51]  We see no cause to upset the panel's decision on the basis that it does not comport with whatever "law of the case" Petitioners contend that *IMB I* created.  Had this Court believed that the additional evidence proffered to the panel regarding the 1991 Contract and custom and usage was superfluous, we would have entered judgment rather than remand the matter for further proceedings when this case was previously before us.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the order of the Business Court Division dismissing the underlying matter from its docket in reliance on the conclusions reached in the arbitration panel's final decision.

Affirmed.

---

[51] Petitioners contend in their first assignment of error that this legal application was error.  By Petitioners' own concession, the first assignment of error is a merits-challenge to the Final Decision, not jurisdictional, and, therefore, is precluded from this Court's review.